**Emil Avgoustov KRASTEV;
Neli Pecheva Krasteva,
Petitioners,**

v.

**IMMIGRATION & NATURALIZATION
SERVICE, Respondent.**

No. 01–9522.

United States Court of Appeals,
Tenth Circuit.

June 17, 2002.

---

Peter Popov, Beverly Hills, California, for the petitioners.

David V. Bernal, Assistant Director (Emily Anne Radford, Assistant Director, and Brian G. Slocum, Attorney, on the brief), Department of Justice, Civil Division, Office of Immigration Litigation, Washington, D.C., for the respondent.

Before EBEL, McKAY and BRISCOE, Circuit Judges.

BRISCOE, Circuit Judge.

Petitioners Emil Avgoustov Krastev and Neli Pecheva Krasteva, unrelated natives and citizens of Bulgaria, petition for review of a decision of the Board of Immigration Appeals (BIA) dismissing their appeal from the denial of their application for asylum and withholding of deportation. We have jurisdiction over this appeal pursuant to Section 106(a) of the Immigration and Nationality Act (INA), 8 U.S.C. § 1105a(a), as amended by Section 309 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), which applies to judicial review regarding aliens placed in immigration proceedings prior to April 1, 1997. We conclude that the Board erred in determining that the evidence of changed conditions was sufficient to rebut a presumption of a well- founded fear of future persecution, reverse in part, affirm in part, and remand for further proceedings.

### I.

Petitioners entered the United States on or about June 20, 1994, as nonimmigrant visitors. On March 23, 1995, the Immigration and Naturalization Service (INS) issued an order to show cause to each petitioner, alleging deportability under INA § 241(a)(1)(B) for having remained in the United States longer than permitted. Both petitioners admitted the allegations, conceded deportability, and requested relief in the form of asylum and withholding of deportation.

*Asylum and withholding of deportation*

A request for asylum involves a two-step process. First, the applicant has the burden to prove his or her statutory eligibility for asylum by establishing that he or she is a "refugee." *Woldemeskel v. INS*, 257 F.3d 1185, 1188 (10th Cir.2001). A refugee is defined as any person who is outside the country of that person's nationality "who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A).

There are essentially three methods by which an applicant can establish his or her status as a refugee. One way is by showing he or she has a "well-founded fear of [future] persecution." 8 C.F.R. § 208.13(b)(2) (2001). A second way is by establishing that he or she has suffered past persecution, which gives rise to a presumption that he or she has a well-founded fear of future persecution unless the INS rebuts the presumption by a pre-

ponderance of the evidence. Prior to January 5, 2001, the INS could rebut the presumption by establishing that "since the time the persecution occurred conditions in the applicant's country ... have changed to such an extent that the applicant no longer has a well-founded fear of being persecuted if he or she were to return." 8 C.F.R. § 208.13(b)(1)(i) (1997–2000). Effective January 5, 2001, the regulation was amended to allow the INS to rebut the presumption by establishing either that "[t]here has been a fundamental change in circumstances such that the applicant no longer has a well-founded fear of persecution in the applicant's country of nationality," or by establishing that "[t]he applicant could avoid future persecution by relocating to another part of the applicant's country of nationality ... and under all the circumstances, it would be reasonable to expect the applicant to do so." 8 C.F.R. § 208.13(b)(1)(i) (2001). A third way to establish refugee status is by establishing past persecution so severe as to demonstrate "compelling reasons for being unwilling or unable to return." 8 C.F.R. § 208.13(b)(1)(ii) (1997–2000); 8 C.F.R. § 208.13(b)(1)(iii)(A). This third approach is sometimes referred to as establishing eligibility for a "humanitarian" grant of asylum, and the applicant may establish such eligibility even when no future danger of persecution exists. *Woldemeskel,* 257 F.3d at 1189; *Baka v. INS,* 963 F.2d 1376, 1379 (10th Cir.1992). The amended regulations effective January 5, 2001, also allow an applicant to qualify for humanitarian asylum by showing "there is a reasonable possibility that he or she may suffer other serious harm upon removal to that country." 8 C.F.R. § 208.13(b)(1)(iii)(B) (2001). This "other serious harm" is defined as "harm that is not inflicted on account of race, religion, nationality, membership in a particular social group, or political opinion, but is so serious that it equals the severity of persecution." 65 Fed.Reg. 76121, 76127 (2000).

■ Once an applicant has established his or her "refugee" status and thus eligibility for asylum, the Attorney General exercises discretionary judgment in either granting or denying asylum. *Woldemeskel,* 257 F.3d at 1189; *Kapcia v. INS,* 944 F.2d 702, 708 (10th Cir.1991). The present appeal does not concern this discretionary grant of asylum because that question was not reached in either case. Both the Immigration Judge and the BIA found that petitioners had failed to show they were eligible for asylum.

■ A request for asylum in deportation proceedings commenced prior to April 1, 1997, is automatically considered to include a request for withholding of deportation. 8 C.F.R. § 208.3(b). A withholding of deportation must be granted if the Attorney General determines that the applicant's life or freedom would be threatened "on account of race, religion, nationality, membership in a particular social group, or political opinion" by deportation. *Woldemeskel,* 257 F.3d at 1193. The applicant must establish a clear probability of persecution on one of the specified grounds to qualify for withholding of deportation, which is a higher standard than is applicable to a request for asylum. *Id.*

### Testimony of Emil Krastev

Emil testified that his family had a history of confrontation with the Bulgarian government. In 1947, the government labeled his paternal grandfather an enemy of the country because he resisted the government's take-over of his mill. As a result, Emil's father was denied admittance to University. Emil's maternal grandfather was also arrested by the Communist government and imprisoned for eleven months.

Emil stated that, because of his family's history, he was not allowed to attend University and he entered the military's Institute of Railway Construction. He began working for the railroad in 1985. In 1988, he organized a strike to protest the Communist government's movement to expel ethnic Turks from Bulgaria. As a result, he was arrested and questioned for four days and then allowed to return to work.

In 1989, he joined the Independence Organization for Defense of Human Rights, which led to his being fired from his railroad job because he refused to renounce the group's views or to join the Communist Party. The group changed its name to the Union of Democratic Forces (UDF) in 1990. On January 14, 1990, he and his then five-month pregnant wife organized and attended a UDF meeting in Pleven. A military group with Communist views broke up the meeting and severely beat Emil and his wife, which resulted in his wife suffering a miscarriage. He recognized an army officer, Major Taskov, as one of the persons involved in the beatings. Emil received a series of threatening telephone calls warning him to stop his activities on behalf of the UDF.

Emil's wife and young child obtained visas to go to Italy but Emil had to stay behind because he could not get a visa. After the election of June 18, 1990, the door to Emil's residence was set afire. He received a threatening telephone call saying "[w]e know where your family is." App. at 153. Emil and his wife divorced in order to protect the family.

In 1991, Emil started a business buying and selling citrus fruit to local stores in Pleven. He also used his business to advertise the UDF by distributing leaflets and stickers to his customers. As a result of these activities, the garage where he stored his produce and the UDF materials was set afire. Although Emil contacted the police, they did not come to investi-

gate. The next day Emil went to the police station to file a report and he was assigned to talk to the same officer who had arrested him following the 1988 railroad strike. The officer told him he should stop his UDF activities because they were the cause of his trouble. In February 1992, members of the military accosted Emil's mother, who was also active in UDF, and threatened to rape her. That same year, one of his acquaintances who was active in the UDF was killed and his home was burned to the ground.

Emil had met Neli Krasteva, who had also been persecuted for her participation in the UDF, prior to the summer of 1992. They decided to move to Germany and stayed with Neli's sister in Germany for two months. However, after receiving telephone calls threatening Neli's daughters, who had stayed in Bulgaria with Neli's mother, they returned to Bulgaria. Emil testified that when he returned to Bulgaria, the local police confiscated his passport. Emil stated that, through his work with the UDF, he had obtained information concerning persons murdered by Communist officials that could cause problems if it was revealed. He believed the authorities especially did not want Neli to leave because of information she had relating to the killing of her former husband.

On February 11, 1994, Emil and Neli attended a human rights rally in Pleven. After the rally, they were attacked by military people and beaten with clubs. Emil recognized Major Taskov as one of the assailants. Taskov was at that time the head of military investigations for the local military officer training school. The next day, Emil went to the police station to file a report. The police told him because there was a shortage of manpower, it might take up to four months for an investigation. Emil testified that, at this point, he realized the police would not protect

him and his only option was to leave the country. He obtained a passport through a friend and got a visa to the United States because it was hosting the World Cup soccer tournament and visas were easy to obtain.

Emil testified that he fears returning to Bulgaria because things have not changed since 1994. He is not afraid of the central government, but of local level officials such as Major Taskov, whom the government is unable to control and who have the power to quash any investigation into their activities.

### Testimony of Neli Krasteva

Neli testified that her grandfather was sent to prison for refusing to give up his farm and her father was imprisoned for membership in an anti-Communist group. Her father died after being beaten by police. Neli was not permitted to study English at University because her parents were not members of the Communist Party. She also was unable to find a teaching job after graduation for the same reason.

Neli married a man of Turkish descent. He became affiliated with an organization known as Defense of Human Rights and Freedoms. On January 3, 1988, a meeting of the group was broken up by police. Her husband was arrested and held for seventeen days. Soon after his release, he died of internal injuries caused by beatings he received while in prison. Neli reported his death to the police, but a police captain named Georgiev told her she and her two children would have problems if she insisted on an investigation. After the death of her husband, Neli lost her factory job and began driving a taxi. She became involved with the UDF and spoke about it to her passengers. She actively campaigned for the UDF in the 1990 elections and spoke at meetings against her husband's killers.

In June 1990, Georgiev called and warned her that if she did not cease her political activities, she would be raped and her children would be led into prostitution. Neli fled to Germany with her two children. However, she returned after receiving telephone calls threatening her mother in Bulgaria. Neli testified that she "lived in endless fear" after returning to Bulgaria. App. at 234. In September 1991, her car was broken into and she found a note inside the car saying she would be punished if she continued her anti-Communist activities. When she reported the break-in to the police, she was informed they were very busy and that her "non-standard political convictions" were the problem. *Id.* at 235. In February 1992, she and her daughter were threatened with rape by a group of military officers.

Neli began working with Emil in his produce business and his UDF activities. In June 1992, she received a letter from a Communist group known as the "Red Avengers" threatening punishment if she continued her UDF activities. Following this threat, Neli and Emil went to Germany and they considered seeking asylum in Germany, but they returned to Bulgaria after her children were threatened. When she returned, local authorities confiscated her passport and held it for about a year. After police refused to investigate their beating following a political rally in February 1994, Neli and Emil decided they needed to leave the country for their own safety. Neli stated that she fears going back to Bulgaria. She has received reports that attempts have been made to break into her house in Bulgaria and her daughters fear their telephone calls are being monitored.

### Supporting evidence

Both petitioners submitted medical certificates purporting to be from the University of Medicine in Pleven detailing head injuries suffered in the alleged 1994 beat-

ing. Emil testified that injured parties are required to obtain such certificates if the injuries might lead to criminal prosecution. Petitioners also introduced numerous affidavits from media experts and college professors who had done extensive research in Bulgarian politics. The affiants generally opined that petitioners' stories of persecution were plausible in light of the conditions in Bulgaria, and confirmed that the situation is one where the weak central government allows former Community Party officials to retain significant power at the local level and to harass their enemies with relative impunity. The affiants concluded the political polarization of the central government makes significant change in the future unlikely.

### Government reports

Two government reports were introduced into evidence: the State Department's Country Report on Human Rights Practices for 1995 (issued April 1996) and the January 1995 Bureau of Democracy, Human Rights and Labor Profile of Asylum Claims and Country Conditions for Bulgaria.

The Country Report notes that the Bulgarian Socialist Party and two nominal coalition partners won an absolute majority in pre-term elections in December 1994 and formed a government in 1995, and that "[m]ost citizens have little confidence in their legal system." App. at 266. The Country Report states that most security services, including the police, are controlled by the Ministry of the Interior. It notes that a "number of persons known to be involved in repressive activities during the Communist regime returned to senior-level positions in the security services in 1995" and that "[s]ome members of the police force committed serious human rights abuses." *Id.* Further, "the police have generally refused the requests of human rights groups to make investigative reports available to the public." *Id.* at

267. The Country Report also stated that "[t]he climate of impunity that the Government allows to prevail is the single largest obstacle to ending such abuses." *Id.* However, it indicates "[t]here were no reports of politically motivated disappearances." *Id.*

The Profile states that Bulgaria "appears firmly committed to democracy," and that a number of European countries include Bulgaria in the "safe country of origin" category, meaning that refugees may be returned there. *Id.* at 283. According to the Profile, most Bulgarian applicants claim past persecution under the Communists and that, while such claims may be plausible, the situation has improved greatly in the past five years and altered conditions remove the presumption that past mistreatment will lead to mistreatment in the future. It states that "most plausible mistreatment is now local or personalized rather than national in origin and can be averted by recourse to internal relocation or to the nascent legal structure." *Id.* It further states there is no stigma or punishment for asylum applicants who return, and "many serious dissidents from the past have done so to visit or reside tranquilly." *Id.* The Profile concludes that "[m]ost Bulgarians have an exceptionally difficult task in plausibly establishing that [they] would face mistreatment, or treatment different from that received by other Bulgarians, upon return to their own country." *Id.* at 284. The Profile states that many applicants for asylum express concern over retribution from "unreconstructed political leaders," many of whom held office under the previous regime and have found a home within the Bulgarian Socialist Party. *Id.* However, according to the Profile, there is no indication that authorities "are seeking to move against politically uncongenial elements." *Id.*

*Administrative decisions*

The Immigration Judge found that petitioners had "not presented a credible accounting of the facts." *Id.* at 118. He further found that petitioners had failed to establish a well-founded fear of persecution even assuming their stories were true, and ruled that petitioners were not eligible for asylum. On appeal, the BIA stated:

> We have considered the arguments made by the applicants on appeal but are not persuaded. *Assuming the applicants suffered persecution prior to their departure from Bulgaria in 1994, the evidence of changed conditions in Bulgaria is sufficient to rebut the presumption that the applicants have a well-founded fear of persecution if forced to return.* See Exhibit 9. General strife to which the populace as a whole is subject cannot serve as the basis of a persecution claim absent special circumstances. Moreover, inasmuch as the applicants have failed to satisfy the burden of proof required for asylum, it follows that they have also failed to satisfy the higher standard required for withholding of deportation.
>
> With respect to the assertion that asylum should be granted to the applicants despite the absence of a well-founded fear, we conclude that the applicants have failed to demonstrate compelling reasons arising out of the severity of the past persecution for being unable or unwilling to return to Bulgaria. Accordingly, the appeal is dismissed.

*Id.* at 2 (internal citations omitted) (emphasis added).

## II.

■ In asylum cases where the BIA does not specifically adopt the reasoning of the Immigration Judge, we review only the decision of the BIA. *See Luna–Rodriguez v. INS,* 104 F.3d 313, 315 (10th Cir.1997). The decision of the BIA that an applicant is not eligible for asylum must be upheld if supported by reasonable, substantial and probative evidence on the record as a whole. *Woldemeskel,* 257 F.3d at 1189. The decision can be reversed only if the evidence presented by the applicant shows that a reasonable factfinder would conclude there was a requisite fear of persecution. *Id.*

■ The BIA assumed the evidence presented by petitioners established past persecution. This created a presumption that petitioners had a well-founded fear of future persecution and, thus, were eligible for asylum. 8 C.F.R. § 208.13(b)(1) (1997–2000). Therefore, it was incumbent upon the INS to rebut that presumption by showing, by a preponderance of the evidence, that "since the time the persecution occurred conditions in the applicant's country try ... have changed to such an extent that the applicant no longer has a well-founded fear of being persecuted if he or she were to return." *Id.* § 208.13(b)(1)(i).

In analyzing the question of whether the INS presented sufficient evidence to rebut the presumption, it is important to consider the basis for petitioners' claims of past persecution and fear of future persecution. While petitioners presented evidence that they suffered persecution for their political views under the former Communist government of Bulgaria, they also presented evidence that, after the Communist government was driven from power, they were still subject to persecution for their views at the local level by certain former Communist government officials and by groups under their control. Petitioners claimed the central government was unable or unwilling to control these groups. We have held that "the possible persecution to be established by an alien in order for him to be eligible for asylum may come from a non-government agency which the government is unwilling or unable to con-

trol." *Bartesaghi–Lay v. INS*, 9 F.3d 819, 822 (10th Cir.1993).

It is also important to consider the applicable period of time during which petitioners' persecution occurred. The majority of the alleged persecution occurred between 1990 and 1994. The final incident which led to petitioners fleeing the country was alleged to have occurred on February 11, 1994, when petitioners were attacked and beaten with clubs by a group of people led by a local military officer. Therefore, in order to show a change in conditions sufficient to rebut the presumption of a well-founded fear of future persecution, the INS was required to introduce evidence that showed that, since February 11, 1994, conditions in Bulgaria had changed to such an extent that petitioners' fear of persecution from local officials was no longer well-founded.

The BIA determined that the Country Report was sufficient to rebut the presumption. The 1995 Country Report does state there were no reports of politically-motivated disappearances and that the Bulgarian government generally respected the rights of its citizens. However, these two statements say little about the particular situation petitioners claim to be facing, which did not arise at the hands of the Bulgarian government but from actions of local officials whom the central government was unable or unwilling to control. Further, essentially the same language indicating there were no politically-motivated disappearances and the Bulgarian government generally respected the rights of its citizens can be found in the Country Reports for 1990–1994, even though this was the period during which petitioners claim much of the persecution against them was taking place. As a result, this language provides no support for the proposition that a material change in conditions occurred between February 11, 1994, and

the time the report was issued in April 1996.

Instead, the 1995 Country Report is overwhelmingly favorable to petitioners' claims, noting that a number of persons known to be involved in repressive activities during the Communist regime have returned to senior-level positions in the security services such as the police, and that "[s]ome members of the police force committed serious human rights abuses." App. at 266. The Country Report goes on to state that observers have charged "the security forces are not sufficiently accountable to Parliament or to society and that the resultant climate of impunity is a major obstacle to ending police abuses." *Id.* Further, while the Country Report states that most of the reported human rights abuses were directed toward the Rom minority, it indicates that "the police have generally refused the requests of human rights groups to make investigative reports available to the public" and "[t]he climate of impunity that the Government allows to prevail is the single largest obstacle to ending such abuses." *Id.* at 267.

There is nothing in the Country Report to indicate that at the time it was published the government was more willing to control the local groups than it was when petitioners left Bulgarian in 1994. While it does provide information that overall conditions in Bulgaria for those critical of the prior Communist government have changed favorably since its fall from power, it provides no information that conditions changed between 1994 when petitioners were, according to the BIA's assumption, still subject to persecution, and the issuance of the report.

The BIA's conclusory reliance on the Country Report reflects no consideration of the individualized circumstances facing petitioners. While a state department report on country conditions may be proba-

tive in a well-founded fear case, *see Gonahasa v. INS,* 181 F.3d 538, 542 (4th Cir. 1999), we have cautioned that use of such official report

> does not substitute for an analysis of the facts of each applicant's individual circumstances. Uncontroverted facts may be inapplicable to or of limited probative value in individual cases and the Board must remain open to this possibility. The petitioners are therefore right to demand that the BIA engage in a careful, individualized review of the evidence presented in their applications and hearings.

*de la Llana–Castellon v. INS,* 16 F.3d 1093, 1098 (10th Cir.1994) (quoting *Kaczmarczyk v. INS,* 933 F.2d 588, 594–95 (7th Cir.1991)). *See Chand v. INS,* 222 F.3d 1066, 1079 (9th Cir.2000) (holding that "the determination of whether or not a particular applicant's fear is rebutted by general country conditions information requires an individualized analysis that focuses on the specific harm suffered and the relationship to it of the particular information contained in the relevant country reports" and that information about general changes in the country is not sufficient). If the BIA had engaged in a careful, individualized review of the evidence presented, it might have realized that the Country Report did not support its conclusion, but · was actually favorable to the position of petitioners.[1]

The situation in this case is analogous to *Gui v. INS,* 280 F.3d 1217 (9th Cir.2002).

In *Gui,* an applicant from Romania demonstrated past persecution, thus raising the presumption of future persecution. The BIA issued a very general order stating that country conditions had changed, but cited no evidence. The INS proffered the 1995 Country Report on Romania as evidence supporting the finding of changed conditions. However, the Ninth Circuit found the Country Report did not support the finding, stating:

> That report—now seven years old—noted that "police continue to use excessive force during arrest and to beat detainees." While the INS cites to the report's finding that "[t]here were no reports of political or other extrajudicial killings" in 1994, this is hardly sufficient to establish, by the preponderance of evidence that 8 C.F.R. § 208.13(b)(1)(i)(A) requires, that conditions have changed so much that Mr. Gui no longer has a well-founded fear or persecution.

*Id.* at 1229 (internal citation omitted). Similarly, in the case at hand, the 1995 Country Report is wholly insufficient to establish by a preponderance of the evidence that conditions in Bulgaria had so changed that petitioners no longer had a well-founded fear of persecution.

Although the 1995 Country Report was the only evidence cited by the BIA in support of its finding of changed conditions, we are obligated to base our determination on whether its decision was supported by substantial evidence on the

---

**1.** The minimal degree to which the BIA considered the individual situations of petitioners is reflected by its order. After stating that "the evidence of changed conditions in Bulgaria is sufficient to rebut the presumption that the applicants have a well-founded fear of persecution if forced to return" and citing the Country Report, the BIA order states that "[g]eneral strife to which the populace as a whole is subject cannot serve as the basis of a persecution claim absent special circum-

stances." App. at 2. It is unclear why the BIA made this statement as petitioners did not make such a claim. Petitioners' claim was that they specifically suffered persecution at the hands of local officials for their political views and participation. They claimed that if they returned, they would be subject to similar persecution. There is nothing in their claim to lead to the conclusion that it pertains to "[g]eneral strife to which the populace as a whole is subject."

administrative record as a whole. *See Woldemeskel*, 257 F.3d at 1189. Therefore, we must determine whether the remainder of the administrative record provides evidence to support the BIA's finding of changed conditions.

The INS points to the Profile which states that, since the fall of the Communist government, "country conditions have so altered as to remove the presumption that past mistreatment in the Communist years will lead to mistreatment in the future." App. at 283. That statement would be probative if petitioners were only alleging past persecution suffered during the reign of the Communist government. However, the bulk of the alleged incidents occurred after that government's fall from power.

The INS also points to language in the Profile stating that "[a] number of European countries include Bulgaria in the 'safe country of origin' category," meaning that refugees can be returned there. *Id.* Again, this does little to address petitioners' specific claims of concern on a more local level. Further, no evidence was introduced showing that this "safe country of origin" designation was a material change from 1994 when petitioners left Bulgaria.

The INS further cites language in the Profile stating that the most plausible source of mistreatment is now local or personalized and "can be averted by recourse to internal relocation or to the nascent legal structure without the necessity of seeking political asylum abroad." *Id.* However, there is no indication that this circumstance changed from the period of time from when petitioners left Bulgaria to the time the report was issued.[2]

Finally, the INS notes language in the Profile stating that "[m]ost Bulgarians have an exceptionally difficult task in plausibly establishing that [they] would face mistreatment, or treatment different from that received by other Bulgarians, upon return to their own country," and that the "passage of time has meant that recent arrivals and young people perforce center their claims in the context of the vastly improved situation of the past five years." App. at 283–84. This provides no evidence to show that the source or response to persecution faced by petitioners had changed substantially between the time of the alleged persecutions and the time of the issuance of the Profile. Further, the fact that the situation has improved vastly from 1990 to 1995 (the "past five years") is not persuasive in this case where the majority of the persecution suffered by petitioners is alleged to have occurred during that time period.

The INS also cites a number of cases that have found that former dissidents can now safely return to Bulgaria: *Kratchmarov v. Heston*, 172 F.3d 551 (8th Cir.1999); *Bachkova v. INS*, 109 F.3d 376 (7th Cir. 1997); *Tzankov v. INS*, 107 F.3d 516 (7th Cir.1997); *Krastev v. INS*, 101 F.3d 1213 (7th Cir.1996); *Mitev v. INS*, 67 F.3d 1325 (7th Cir.1995). However, in those cases, the alleged past persecution occurred under the former Communist regime, making the change in government that occurred after the persecution took place highly probative. Thus, the cases are of little value here where the majority of the alleged persecution arose after the Communist government was removed from power.

Considering the record as a whole, there is no evidence from which a reasonable factfinder could conclude, by a preponder-

---

**2.** This information might be probative to determine whether the evidence establishes, under the new regulations effective January 5, 2001, that "[t]he applicant could avoid future persecution by relocating to another part of the applicant's country of nationality ... and under all the circumstances, it would be reasonable to expect the applicant to do so." 8 C.F.R. § 208.13(b)(1)(i) (2001).

ance of the evidence, that the conditions in Bulgaria had changed by 1995 to the extent that the past persecution suffered by petitioners as late as 1994 no longer gave rise to a well-founded fear of future persecution. The evidence presented regarding conditions in Bulgaria in 1995 for the most part fails to address the situation complained of by petitioners, and where the evidence does address the situation, it is favorable to petitioners. Here, the BIA assumed that petitioners' accounts were true and established past persecution. This gave rise to a presumption of a well-founded fear of future persecution, which was not rebutted by the evidence presented by the INS. As a result, we must conclude that, assuming as the BIA did that petitioners' claims of past persecution were credible, "a reasonable factfinder would have to conclude that the requisite fear of persecution existed." *Woldemesk-el,* 257 F.3d at 1189.[3]

■ As a general rule, where there is no indication that the applicant's testimony is untruthful and an appellate court finds that the INS has failed to rebut the presumption of a well-founded fear of future persecution based on past persecution, the court has held that the applicant is to be considered eligible for asylum. *See, e.g., Gui,* 280 F.3d at 1230; *Leiva–Montalvo v. INS,* 173 F.3d 749, 752 (9th Cir.1999). However, in the instant case, the Immigration Judge found that petitioners' assertions of past persecution were not credible. Where doubts have been raised as to the credibility of the applicant by either the Immigration Judge or the BIA, but the BIA makes no finding with regard to credibility, courts have held that the proper procedure is to remand to the BIA for a credibility determination. *See Hartooni v.*

*INS,* 21 F.3d 336, 343 (9th Cir.1994); *Canjura–Flores v. INS,* 784 F.2d 885, 889 (9th Cir.1985). In so doing, however, we caution the BIA that its practice of simply assuming, without deciding, credibility is not favored.

> Although we will continue to follow the practice of remanding to the Board for credibility findings when we disagree with Board decisions holding that the petitioner has not met his burden of proof even if credibility is assumed, we discourage the Board from taking this approach. If the immigration judge or the Board finds that an alien's testimony lacks credibility and that the testimony would not support a claim for asylum or withholding even if it were credible then these conclusions should be stated in the alternative. If immigration judges and the Board evaluate credibility in each case, remand will not be necessary and further delays in the processing of asylum claims can be avoided.

*Id.* at 889 n. 1.

On remand, if the BIA determines that petitioners' evidence of past persecution is credible and gives rise to a presumption of well-founded fear, the BIA is further directed to consider whether this presumption is rebutted by a preponderance of the evidence establishing that petitioners "could avoid future persecution by relocating to another part" of Bulgaria and that "under all the circumstances, it would be reasonable to expect the [petitioners] to do so." 8 C.F.R. § 208.13(b)(1)(i).

### III.

■ Petitioners also argue that the BIA erred in finding they failed to establish their entitlement to "humanitarian asy-

---

**3.** As we are remanding to the BIA for further consideration, we do not reach petitioners' arguments that the BIA erred in considering the 1995 Country Report or that it should have used the new regulations effective January 5, 2001, to analyze the claim of well-founded fear of future persecution.

lum" under 8 C.F.R. § 208.13(b)(1)(iii)(A) arising out of the severity of their past persecution. To establish eligibility for humanitarian asylum under that section, an applicant must establish "compelling reasons for being unwilling or unable to return to the country arising out of the severity of the past persecution." *Id.*

We have held that the past persecution necessary to establish eligibility for humanitarian asylum must have been so severe that it would " 'so sear a person with distressing associations with his native country that it would be inhumane to force him to return there, even though he is in no danger of future persecution.' " *Nazaraghaie v. INS,* 102 F.3d 460, 463 (10th Cir.1996) (quoting *Baka,* 963 F.2d at 1379). *See Bucur v. INS,* 109 F.3d 399, 404–05 (7th Cir.1997) (characterizing humanitarian asylum as being reserved for situations such as the German Jews, the victims of the Chinese "Cultural Revolution," and survivors of the Cambodian genocide). Although petitioners have presented facts which, if true, show they were subject to persecution, their claims do not show persecution so severe as to reach the level necessary for humanitarian asylum.

### IV.

Petitioners raise no arguments challenging the BIA's decision that they did not meet the stricter standard for proving their entitlement to withholding of deportation. Issues not raised on appeal are deemed to be waived. *See Coleman v. B–G Maint. Mgmt. of Colo., Inc.,* 108 F.3d 1199, 1205 (10th Cir.1997).

### V.

We AFFIRM the BIA's decision that petitioners are not eligible for humanitarian asylum or the withholding of deportation. As we conclude the BIA erred in determining that the evidence was sufficient to rebut a presumption of well-founded fear, we REVERSE the BIA's decision in that regard and REMAND for further consideration.