**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAY 17 2004**

**PATRICK FISHER**
**Clerk**

UNITED STATES COURT OF APPEALS

FOR THE TENTH CIRCUIT

---

MARIA DEL ROSARIO
MOGOLLON; CAMILO ARMANDO
GUTIERREZ,

Petitioners,

v.

JOHN ASHCROFT,

Respondent.

No. 03-9523
(BIA Nos. A79-475-243 &
A79-475-244)
(Petition for Review)

---

ORDER AND JUDGMENT *

---

Before **BRISCOE** and **McKAY** , Circuit Judges, and **BRORBY** , Senior Circuit
Judge.

---

After examining the briefs and appellate record, this panel has determined

unanimously to grant the parties' request for a decision on the briefs without oral

argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore

ordered submitted without oral argument.

---

\* This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel. The court
generally disfavors the citation of orders and judgments; nevertheless, an order
and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

Petitioner Maria del Rosario Mogollon and her husband, petitioner Camilo Armando Gutierrez, seek review of the denial of their asylum claim.[1] Petitioners, who are citizens of Colombia, contend they are entitled to asylum because they have been persecuted and they fear future persecution on account of their political opinions and their membership in a particular social group. Petitioners were rather vague as to the nature of that group in their filings before the agency, but in their opening brief before this court, they argue that the relevant social group is that of "successful business people."[2] Aplt. Amended Opening Br. at 8. Because the alleged persecution was aimed at Maria, Camilo's claim for asylum is dependent on Maria's claim.

After an evidentiary hearing, the immigration judge (IJ) determined that petitioners were removable and that they were not eligible for asylum because they had failed to demonstrate past persecution or a well-founded fear of future persecution on account of any of the statutory bases. The Board of Immigration Appeals (BIA) summarily affirmed under 8 C.F.R. § 1003.1(a), leaving the IJ's decision as the final agency determination for review. *See Tsevegmid v. Ashcroft*,

_____

[1] Petitioners also pursued claims before the agency for restriction on removal under the Immigration and Nationality Act and for withholding of removal under the Convention Against Torture. They do not challenge the denial of either of these claims before this court, however, so we need not consider them. *See United States v. Abdenbi*, 361 F.3d 1282, 1289 (10th Cir. 2004).

[2] We note that respondent does not argue that petitioners failed to preserve this issue before the agency.

336 F.3d 1231, 1235 (10 th Cir. 2003). We conclude that the IJ's decision is supported by substantial evidence and we therefore deny the petition for review.

Obtaining asylum is a two-step process. First, the applicant must establish that she is statutorily eligible for the relief by showing she meets the definition of a "refugee" under the Immigration and Nationality Act (INA). *Krastev v. INS*, 292 F.3d 1268, 1270 (10th Cir. 2002). Then the applicant must persuade the Attorney General to exercise his discretion to grant the requested relief. *Id.* at 1271. The IJ concluded that petitioners failed to establish that they qualified as "refugees" at the first step of the process.

The INA defines a "refugee" as someone outside his or her native country "who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). To make the required showing, an applicant may establish that she suffered persecution in the past on a protected ground. If she makes a showing of past persecution, then a rebuttable presumption arises that she has a well-founded fear of future persecution if she were to return to her native country. *Yuk v. Ashcroft*, 355 F.3d 1222, 1233 (10th Cir. 2004).

If the applicant fails to show past persecution, she may still be able to establish a well-founded fear of future persecution. This showing has two components: "a subjective 'fear' component and an objective 'well-founded' component." *Kapcia v. INS*, 944 F.2d 702, 706 (10th Cir. 1991). The applicant must first establish the objective component, which "requires a showing, by credible, direct, and specific evidence in the record, of facts that would support a reasonable fear that the [applicant] faces persecution" on account of an enumerated ground. *Id.* (quotations omitted). If she establishes this component, then she must establish that her "fear is genuine." *Id.* The IJ found that petitioners genuinely did not want to return to Colombia, but he also found that they did not establish a well-founded fear of future persecution based on any of the enumerated grounds.

The evidence before the IJ showed that Maria and her husband Camilo lived in Bogota, where Camilo had a business with his sister. Maria's extended family had been active in the Liberal Party for several generations. Maria herself was a member of the Liberal Party, though she was not particularly active. In 1992, Maria's father and brother, who were campaigning for a mayoral candidate in her parents' hometown, began getting threatening phone calls from people who identified themselves as members of the Revolutionary Armed Forces of Columbia ("FARC"), a leftist guerrilla group. The callers warned them to stop

-4-

their political and community service activities because those activities were helping the government; the FARC wanted to undermine the government. As a result of the threats, Maria's parents and other members of her extended family ceased their political and charitable activities, but her brother Carlos did not.

Carlos was the manager of a bank in Venecia, a small village in the heart of the FARC's stronghold. For many years, he helped the local people obtain loans for their crops and livestock through the bank and he was very active in community service. In February 1997, a band of FARC guerillas attempted to raid Venecia, but they were repelled by the local police. When the guerillas left, they threatened to gather their forces and come back. Based on this threat, the mayor requested reinforcements from the military and the national police, but none were forthcoming.

In May 1997, a group of about thirty armed men came into Venecia at night. This time, only two policemen were in the village, and they lost their lives trying to fight off the men. The men went to Carlos' home and took him by force to the bank, where they tried to make him open the vault. When they discovered that Carlos had only half the code to the vault, they kidnaped the woman who had the other half and brought her to the bank as well. Even together, the two could not open the vault because it was on a time lock. The men then blew up the bank with dynamite to get the money. They let the woman go free, but not Carlos.

Before they left Venecia, the men also blew up some government offices and another bank, they pillaged the stores, and they fired many shots into the air. When the frightened townspeople finally emerged from their homes, they found Carlos' body in the street. He had been stabbed and shot numerous times. Shortly thereafter, the military arrived. They assessed the damage and contacted Carlos' family. Maria said the colonel who spoke with her told her the attackers were FARC guerillas. At least one newspaper account of the attack also identified the perpetrators as FARC guerillas.

The next day, Maria and her parents traveled to Venecia, where they began asking questions about what had happened. Maria testified that shortly after she returned from Venecia, she began getting threatening phone calls advising her to stop looking into her brother's death. She and her family did not stop their investigation, however. In fact, they decided to file a lawsuit against the government for failing to come to the aid of the town when the mayor requested.

Before the suit could be filed, the family had to gather information for their lawyer. Because the suit was going to be filed in Bogota, Maria took the lead in gathering the necessary information. As Maria's investigation continued, so did the threats–against her and against other members of her family. Eventually, the fear and anxiety engendered by the threats led Maria and Camilo to seek psychiatric counseling.

Although the threats continued for several years, no apparent attempt was made to carry them out. Maria was able to continue gathering information, and in March 1999, the lawyer was able to file the lawsuit. The suit named as plaintiffs: Maria's parents, Maria, Maria's sister (who lives in the United States), Carlos' wife at the time of his death, and his daughter by that wife. It named as defendants: the National Police Force, the Ministry of Defense, and the National Army. The suit sought damages against the defendants for Carlos' death on the ground that the defendants failed to provide sufficient protection to the people of Venecia.

In December 1999, seeking an escape from the threats, Maria, Camilo, and Maria's parents came to the United States for a vacation. Maria and Camilo returned to Colombia after about a month. Upon their return, the threats increased in frequency and Maria began to be followed when she went out. Again, though, no physical harm befell her.

Maria testified that she believed members of the FARC were responsible for the threats and the surveillance. She said the FARC wanted to stop her family from investigating Carlos' death and from filing their lawsuit because the FARC feared that the family's activities would bring to light the FARC's involvement in

the raid on Venecia. [3] She also testified that she never notified the police of either the threats or the surveillance because she did not think it would do any good and because the callers told her not to contact the authorities.

By June 2000, Maria had decided she could bear the strain no longer, so she left Colombia. Maria entered the United States on a six-month visitor's visa, which she later extended for another six months. Camilo testified that after Maria left, he received phone calls asking him where Maria had gone and what she was doing. When he told the callers that Maria had left the country, they told him that she should stay away because if she came back, she might be killed like her brother. Camilo testified that the callers identified themselves as members of the FARC.

Camilo remained in Colombia for almost a year before joining Maria and seeking asylum in the United States. [4] Maria's mother also came to the United States and sought asylum, but her father and her nieces and nephews–including Carlos' five children–stayed in Colombia. Maria testified that Camilo's sister

---

[3]    Maria did not attempt to reconcile the motive she attributed to the FARC with other evidence she presented showing that the public already knew the FARC was responsible for the raid.

[4]    Camilo's visa shows that between his visit in December 1999 and his final entrance in May 2001, he also entered the United States in September 2000. Admin. R. at 537.

was running the business in Camilo's absence. She also testified that as far as she knew, the lawsuit was still proceeding.

In his oral ruling, the IJ found that some of petitioners' testimony was credible, but he did not believe all of it. He discussed the State Department country reports, which showed that Colombia has been in a state of great civil unrest for more than thirty years and indicated that sometimes common criminals masqueraded as members of the FARC or other guerillas groups. Even if the men who killed Carlos were FARC guerillas, however, the IJ found that it was not clear that Carlos was killed because of his political opinions; the men may just have been after the bank's money. "In Colombia," the IJ noted, "the guerillas don't care who it is, they kill whenever they feel like killing. They bomb whenever they feel like bombing, and that's strictly for purposes of disrupting the government." Admin. R. at 107-08.

The IJ did not believe that the family's lawsuit would motivate the FARC to single out Maria and Camilo for persecution, because the suit was against the government, and the FARC encouraged disruption of the government. "In fact," he said, "it would seem to me, that they would be happy with that situation, indicating that, in fact, they're disrupting the government . . . ." *Id.* at 107. The IJ also noted that Maria and Camilo lived in Bogota, which is a very large city and is not under the control of the FARC. Finally, the IJ found that Maria and

Camilo did not have any particular stature in the Liberal Party such that the FARC would single them out for persecution. The IJ therefore concluded that petitioners had not shown either past persecution or a well-founded fear of future persecution on account of their political opinions or any other statutory factor.

Because the IJ found that petitioners failed to establish their status as refugees, we review only that initial determination. *See Vatulev v. Ashcroft*, 354 F.3d 1207, 1209 (10th Cir. 2003). We apply a substantial evidence standard to the IJ's determination. *Yuk*, 355 F.3d at 1233. Under that deferential standard, we may not reweigh the evidence, and we may reverse the IJ's findings only if "the record demonstrates that any reasonable adjudicator would be compelled to conclude to the contrary." *Id.* (quotations omitted); *see also* 8 U.S.C. § 1252(b)(4)(B).

In their opening brief, petitioners state that they do not dispute the IJ's credibility findings. Instead, they point to the volume of evidence showing that they received repeated threats when they began investigating Carlos' death, that the threats had a detrimental effect on Maria, and that members of the FARC routinely harass, torture, and kill people and conduct raids similar to the one on Venecia. Petitioners argue that this evidence establishes that Maria was persecuted by the FARC and that she has a well-founded fear of being persecuted by them in the future if she returns to Colombia. But petitioners do not address

the IJ's determination that they failed to demonstrate a well-founded fear of persecution *on account of* their political beliefs or their membership in a particular social group.

To show persecution on account of their political opinions, petitioners had to show that they held political opinions of which their persecutors were aware, that they had been persecuted or had a well-founded fear of future persecution, and that the persecution had been or would be because of their political opinion. *See Sangha v. INS*, 103 F.3d 1482, 1487 (9th Cir. 1997). The persecution had to derive from petitioners' own political beliefs, not those of their persecutors, *INS v. Elias-Zacarias*, 502 U.S. 478, 482 (1992), and petitioners had to show "something more than violence plus disparity of views," *Sangha*, 103 F.3d at 1487. In their opening brief, however, petitioners make little attempt to show that the IJ erred in finding no past or future persecution on account of their political beliefs, and they fall far short of showing that a reasonable factfinder would be compelled to conclude to the contrary.

Petitioners' failing is even greater with respect to their claim of persecution on account of their membership in a particular social group. Even if "successful business people" qualified as the kind of social group to which the INA was meant to give refuge, a matter we need not decide, *see Castellano-Chacon v. INS*, 341 F.3d 533, 546-48 (6th Cir. 2003) (discussing how agency and circuits have

defined concept of particular social group), petitioners point to no evidence that they were persecuted, or that they have a well-founded fear of future persecution, on account of their membership in that group.

Under our deferential standard of review, we must affirm the denial of petitioners' asylum claim. The petition for review is therefore DENIED.

Entered for the Court


Mary Beck Briscoe
Circuit Judge