**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**February 2, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

ISSA DIAKHITE,

              Petitioner,

v.

ALBERTO R. GONZALES, * Attorney
General of the United States,

              Respondent.

No. 04-9534
(No. A95-542-852)
(Petition for Review)

_____

**ORDER AND JUDGMENT** **

_____

Before **BRISCOE**, **ANDERSON**, and **MURPHY**, Circuit Judges.

_____

After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument.

_____

\* On February 4, 2005, Alberto R. Gonzales became the United States Attorney General. In accordance with Rule 43(c)(2) of the Federal Rules of Appellate Procedure, Mr. Gonzales is substituted for John Ashcroft as the Respondent in this action.

\*\* This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

Petitioner Issa Diakhite is a native and citizen of Mauritania facing removal from this country. He petitions for review of a decision of the Board of Immigration Appeals (BIA) denying his requests for asylum, withholding of removal, and relief under the Convention Against Torture, though his petition focuses solely on the asylum decision. The BIA acknowledged that petitioner had been persecuted on account of his ethnic identity for several years before he left Mauritania in 1995, but found that (1) this past persecution did not reach the level required under *In re Chen*, 20 I. & N. Dec. 16 (BIA 1989), to excuse him from demonstrating a well-founded fear of future persecution, and (2) conditions had changed in Mauritania to an extent that rendered such a fear unfounded. We have jurisdiction to review the denial of asylum under 8 U.S.C. § 1252(a). Because the BIA's decision adheres to applicable legal standards and is supported by substantial evidence, we affirm.

**I**

The basic facts are not in dispute. Petitioner belongs to an African ethnic group settled along the Senegal River in southern Mauritania. In the late 1980s, his family lived outside the city of Kaedi, near the border with Senegal. He and his brother worked for their father, who was a cattle herder and farmer.

In 1989, tensions among Mauritania's various ethnic groups, the politically dominant "White Maurs" of Arab and Berber ancestry, the indigenous African

"Black Maurs" whom they had historically enslaved, and the Sub-Saharan African groups (such as petitioner's) generally located in the Senegal River region, erupted in a violent crisis associated with deteriorated Mauritania - Senegal relations. In ensuing years, Mauritania expelled some 75,000 people of African ancestry, many forced across the river into Senegal; others were killed, assaulted, stripped of their property, and/or imprisoned. The violence extended to petitioner and his family: he testified that in December 1989 his brother was killed, his parents fled across the river to a refugee camp in Senegal, and he was taken to a jail in Kaedi run by the government. He spent the next six years in confinement, working (farming, washing clothes, carting water) without pay, sleeping on the floor, and suffering disciplinary beatings, until he finally escaped into Senegal. He found his parents at a refugee camp, where he stayed for three months. He then went to the capital, Dakar, and worked as a type of porter for six years. He was not paid, but received room and board. The man who gave petitioner that job ultimately arranged for his transportation to the United States. He entered the country in July 2001 and, after being served a notice to appear for removal proceedings in June 2002, applied for asylum.

## II

To obtain asylum, an alien must prove, first, that he is a refugee as defined in 8 U.S.C. § 1101(a)(42)(A), and then persuade the Attorney General to exercise

his discretion and grant relief under 8 U.S.C. § 1158(b). *See Yuk v. Ashcroft*, 355 F.3d 1222, 1232-33 (10th Cir. 2004). The statute defines a "refugee" as "any person . . . outside [his] country of . . . nationality . . . who is unable or unwilling to return to, and is unable or unwilling to avail himself . . . of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A).

Past persecution, as found by the BIA here, may support an asylum request in two distinct ways: (1) by raising a presumption of a well-founded fear of future persecution sufficient to warrant relief, provided the government does not rebut the presumption by showing "a fundamental change in circumstances such that the applicant no longer has a well-founded fear of persecution," 8 C.F.R. § 1208.13(b)(1)(i)(A); [1] or (2) by directly warranting relief, in the absence of any fear of future persecution, provided the applicant demonstrates "compelling reasons for being unwilling or unable to return to the country arising out of the severity of the past persecution," or "a reasonable possibility that he or she may

---

[1]     Another means of rebutting the presumption, by showing that an "applicant could avoid future persecution by relocating to another part of [his] country of nationality," 8 C.F.R. § 1208.13(b)(1)(i)(B), was not relied upon (in fact, was rejected) by the BIA and, thus, cannot support its decision here. *See Mickeviciute v. INS*, 327 F.3d 1159, 1164-65 (10th Cir. 2003) (following *INS v. Ventura*, 537 U.S. 12 (2002), and *SEC v. Chenery Corp.*, 332 U.S. 194 (1947)).

-4-

suffer other serious harm upon removal to that country," *id.* § 1208.13(b)(1)(iii). *See Niang v. Gonzales*, 422 F.3d 1187, 1195 (10th Cir. 2005). Petitioner argues that he should have been granted asylum on both of these grounds.

Whether the materials of record rebutted the presumptive inference from past to future persecution is a question of fact reviewed for substantial evidence. *Marcu v. INS*, 147 F.3d 1078, 1080-81 (9th Cir. 1998). That means we cannot reverse the determination of the BIA unless the record *compels* us to conclude that it was wrong. *Id.*; *see also Nazaraghaie v. INS*, 102 F.3d 460, 463 n.2 (10th Cir. 1996) (noting deferential standard applies even if court is reviewing application of statutory standard to established subsidiary facts).

Information on current conditions in country reports for Mauritania formed the basis of the BIA's determination.[2] Country reports can certainly constitute substantial evidence to support such a determination, *see Yuk*, 355 F.3d at 1236, though it is important to keep in mind that their inherently broad statements may not always address the specific concerns that are salient in a particular case, *see Krastev v. INS*, 292 F.3d 1268, 1276-77 (10th Cir. 2002). In commonsense terms, "to be effective, [such] evidence of changed country conditions must negate a

---

[2] The actual discussion of this information was set out in the oral decision of the Immigration Judge (IJ), but the BIA expressly agreed with this part of the IJ's analysis in summarily concluding that changed conditions negated a well-founded fear of future persecution upon petitioner's return to Mauritania.

petitioner's *particular* fear." *Palma-Mazariegos v. Gonzales*, 428 F.3d 30, 35 (1st Cir. 2005). A comparison of the report deemed inadequate in *Krastev* with the report found sufficient in *Palma-Mazariegos* is instructive: the former report was discounted because it addressed improvement in central government conduct whereas the petitioner's fear arose, rather, from mistreatment by local officials whom the government could not control, *see Krastev*, 292 F.3d at 1276; the latter report was properly relied upon because it indicated that the guerillas whom the petitioner had feared had discontinued their militant activities pursuant to an intervening peace accord, *Palma-Mazariegos*, at 428 F.3d at 35-36. In sum, "[w]hen [a country] report convincingly demonstrates material changes in country conditions that affect the specific circumstances of an asylum seeker's claim, the report may be sufficient, in and of itself, to rebut the presumption of future persecution." *Id*. at 36 (citing examples from case law).

The crisis that prompted the exile and detention of African Mauritanians like petitioner and his family is long since over. The government has welcomed the return of the exiles, with the assistance and oversight of the United Nations High Commissioner for Refugees (UNHCR), and a majority have come back. While some have not chosen to return, the UNHCR has concluded that there is no impediment to their doing so. To be sure, Mauritania still has broad social and political shortcomings in need of improvement. But these do not suggest a

likelihood of persecution – i.e., "infliction of suffering or harm . . . in a way regarded as offensive and [involving] more than just restrictions or threats to life and liberty," *Yuk*, 355 F.3d at 1233 (quotations omitted) – being continued or resumed should petitioner return to the country. The case law contains many examples consistently reaching similar conclusions on the basis of the same country changes considered here. [3]

There is, however, a more specific assertion that figures prominently in petitioner's argument that must be addressed here. He likens his confinement in

---

[3] While these non-precedential decisions do not constrain our review, we reference them for the consistency of assessment they reflect and the additional discussion of the relevant materials they provide, with which we agree: *See, e.g.*, *Haidara v. Gonzales*, No. 04-0999, 2005 WL 3310012 (2d Cir. Dec. 7, 2005) (unpub.); *Diallo v. Gonzales*, 140 F.App'x 612 (6th Cir. 2005) (unpub.); *Sarr v. Gonzales*, 127 F.App'x. 815 (6th Cir. 2005) (unpub.); *Diamengie v. Ashcroft*, 111 F.App'x. 508 (9th Cir. 2004) (unpub.). Petitioner has cited two supplemental authorities involving Mauritanian exiles that he contends support his asylum claim. One, *Diallo v. Ashcroft*, 381 F.3d 687, 700-01 (7th Cir. 2004), involved a man arrested and expelled in 1993 on account of his membership in a political opposition group, and is of little relevance. The other, *In re Dia*, A95-542-942 (BIA April 27, 2004), is an oddity; in it the BIA granted asylum to a Mauritanian exile, summarily rejecting a government changed-conditions argument essentially identical to the one it accepted here and in many other cases (reflected, for example, in the unpublished circuit cases cited above). We are at a loss as to how to harmonize that decision with those in which the BIA denied relief. But given the deferential nature of our review, which allows for a gray area where we would not be *compelled* to reject a BIA determination for either side of a particular dispute, the fact that the BIA decided an apparently similar case in favor of an applicant does not mean we may conclude that it erroneously denied relief here. We trust that, even within this gray area of deferential leeway, the BIA endeavors to maintain a consistency in result worthy of the responsibility with which it is vested by administrative review principles.

the government-run jail to slavery, and points to materials indicating that enslavement of African "Black Maurs" by upper-class Arab-Berber "White Maurs" has deep roots in Mauritanian history and may still be practiced in some isolated areas. Any facial appeal this line of argument may have rests upon its superficial equation of two very different politico-cultural circumstances. There is no evidence of any relevant connection between the government's confinement of some southern Mauritanians like petitioner during the crisis surrounding and following their expulsion to Senegal in 1989 - 1991 and the cultural practice of Black Maur slavery whose isolated historical remnants are noted in the materials. Further, such reports indicate that the practice, if it continues at all, is limited to remote areas of the country, while petitioner's home city of Kaedi is one of the largest urban centers in the country. There is simply no reasonable basis on which to conclude that petitioner has a well-founded fear of being subjected to slavery upon his return to Mauritania.

In light of the above, we cannot say we are compelled to conclude that the BIA erred in finding that the government had rebutted the presumption of future persecution raised by petitioner's adverse experiences during the Mauritanian crisis of the late 1980s and early 1990s. Under our standard of review, we must affirm that finding.

Finally, petitioner contends that he should have been granted humanitarian asylum regardless of the possibility of any future persecution. As noted earlier, one way for petitioner to justify such relief is to demonstrate compelling reasons "arising out of the severity of [his] past persecution" for being unwilling or unable to return to his native country. 8 C.F.R. § 1208.13.(b)(1)(iii). Our cases make it clear that this basis for relief is limited to those whose past persecution was "so severe that it would so sear a person with distressing associations with his native country that it would be inhumane to force him to return there, even though he is in no danger of future persecution." *Krastev*, 292 F.3d at 1280 (quotations omitted); *accord Ngarurih v. Ashcroft*, 371 F.3d 182, 190 (4th Cir. 2004). As the examples discussed in the cited cases reflect, this relief is strictly reserved only to those who suffered the most rare and abhorrent persecution, such as survivors of the holocaust or the Cambodian genocide. Petitioner has not shown persecution of the requisite nature and severity to warrant humanitarian asylum on this basis. A second, recently added, means to justify humanitarian asylum is for the petitioner to establish "a reasonable possibility that he . . . may suffer other serious harm upon removal." 8 C.F.R. § 1208.13(b)(iii). The record does not establish, much less compel, a finding that such a possibility exists.

The petition for review is DENIED.

Entered for the Court

Stephen H. Anderson
Circuit Judge