**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JAN 20 2004**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

HANG KANNHA YUK, SOK
SAMNANG NHIM, THY KORNG,
HORN YUK, and SINOUN KETH,

Petitioners,

v.

No. 02-9546

JOHN ASHCROFT, United States
Attorney General,

Respondent.

AMERICAN IMMIGRATION LAW
FOUNDATION,

Amicus Curiae.

**ON PETITION FOR REVIEW OF AN ORDER**
**OF THE BOARD OF IMMIGRATION APPEALS**
**(BIA Nos. A76-415-466, A76-415-467,**
**A76-415-468, A76-415-469, A76-415-470)**

Jeff Joseph, Denver, Colorado, for Petitioners.

Cindy S. Ferrier, Trial Attorney (Linda S. Wendtland, Assistant Director, with her
on the brief), Office of Immigration Litigation, Civil Division, United States
Department of Justice, Washington, D.C., for Respondent.

Mary A. Kenney, Nadine K. Wettstein, and Beth Werlin filed an amicus curiae
brief for the American Immigration Law Foundation on behalf of Petitioners.

Before **HENRY**, **HOLLOWAY**, and **ANDERSON**, Circuit Judges.

**ANDERSON**, Circuit Judge.

Petitioners, all members of the same extended family, are natives and citizens of Cambodia.[1] Mr. Yuk is the lead petitioner, and the asylum applications of the others rely on essentially the same facts as his.[2] They seek review of an order of the Board of Immigration Appeals ("BIA") affirming the Immigration Judge's ("IJ") decision denying their applications for asylum, withholding of removal and withholding under the Convention Against Torture. We affirm.

---

[1]The petitioners are Mr. Horn Yuk, Ms. Sinoun Keth, Mr. Sok Samnang Nhim, Ms. Thy Korng, and Ms. Hang Kannha Yuk. Mr. Yuk is married to Ms. Keth. Ms. Korng and Ms. Yuk are Mr. Yuk's adult daughters, and Mr. Nhim is Ms. Korng's husband. We will refer to them individually by name or collectively as "petitioners," as our discussion may require.

[2]Petitioners state in their brief that Mr. Nhim and his wife, Ms. Korng, have "applications both dependent on Mr. Yuk's application but also claim independent eligibility for asylum." Petitioner's Br. at 2 n.1. The government asserts that, since petitioners filed only one petition for review from the BIA's final orders in their cases, Mr. Nhim and Ms. Korng may no longer seek review independent from Mr. Yuk. Additionally, in proceedings before the IJ, the parties agreed that Ms. Yuk's application was dependent upon Mr. Yuk's application, even though she is an adult.

## BACKGROUND

Petitioners entered the United States between March and June 1997, each with authorization to remain for six months. They initially came as tourists and to visit relatives in the United States. They applied for asylum under the Immigration and Nationality Act ("INA") § 208, 8 U.S.C. § 1158, in March 1998. While petitioners were residing in West Valley City, Utah, the Immigration and Naturalization Service ("INS") interviewed them regarding their asylum applications, referred those applications to the Immigration Court, and placed petitioners in removal proceedings by issuing them Notices to Appear before an IJ in Salt Lake City. See 8 C.F.R. § 208.14(c).[3] Petitioners were charged with being subject to removal, under INA § 237(a)(1)(B), 8 U.S.C. § 1227(a)(1)(B), for remaining in the United States beyond the date authorized without receiving permission from the INS.

Before the IJ, petitioners admitted having remained in the United States longer than permitted and conceded that they were subject to removal. They filed addenda to their applications for asylum and also applied for withholding of

---

[3]The INS ceased to exist on March 1, 2003, and its functions were transferred to the U.S. Citizenship and Immigration Services ("USCIS") within the newly formed Department of Homeland Security.

removal under INA § 241(b)(3), 8 U.S.C. § 1231(b)(3), and under the Convention Against Torture.[4]

After conducting a hearing, the IJ denied petitioners' applications for asylum because they could not show that they had suffered persecution in the past, nor could they demonstrate a well-founded fear of persecution in the future. Petitioners appealed the IJ's decision to the BIA, which issued a summary affirmance without an opinion, pursuant to the new streamlining regulations then in effect. Petitioners seek review of that order.

Petitioners' claims for asylum are based upon Mr. Yuk's membership in and activities relating to the political party of Prince Norodom Ranariddh, the National United Front for an Independent, Neutral, Peaceful, and Cooperative Cambodia ("FUNCINPEC"). Mr. Yuk became involved with the FUNCINPEC Party in 1982, when it was in its infancy. It was originally formed to oppose the Vietnamese-controlled government then in power. The FUNCINPEC Party attempted to bring a democratic form of government to Cambodia, as well as enable a return of the Cambodian monarchy.

---

[4]The United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Dec. 10, 1984, 1465 U.N.T.S. 85, was implemented in the United States by the Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. No. 105-277, § 2242, 112 Stat. 2681 (1998). See 8 C.F.R. § 208.16(c)(2), .17. It permits withholding of removal for an alien who establishes that "it is more likely than not that he or she would be tortured if removed to the proposed country of removal." Id. § 208.16(c)(2).

Mr. Yuk initially worked covertly in intelligence gathering on behalf of the FUNCINPEC Party. He stated that in 1989 he assumed a supervisory role in intelligence gathering, with a hundred people under him. After 1989, Mr. Yuk was more open and public about his membership in and activities for FUNCINPEC. In 1993, Cambodia had an election monitored by the United Nations, in which the FUNCINPEC candidate, Prince Ranariddh, was elected Prime Minister. Mr. Yuk publicly recruited members for FUNCINPEC prior to the election. He related an incident in which a neighbor and government police officer confronted him and told him that, had he known that Mr. Yuk was a member of the FUNCINPEC party, he would have had him killed.

Despite Prince Ranariddh's victory in the election, Hun Sen, the former Communist Prime Minister and leader of the Cambodian People's Party ("CPP"), threatened civil war if the Prince did not share control of the government with the CPP. Prince Ranariddh was therefore forced to share control of the government with Hun Sen and the CPP. Mr. Yuk testified before the IJ that the FUNCINPEC Party was thwarted whenever it attempted to introduce legislation that its members desired. During this time period Mr. Yuk became the director of the National Police Academy. He avers that he was one of the leaders of FUNCINPEC, in one of the highest positions, and that he reported directly to two men who in turn reported directly to Prince Ranariddh.

In the spring of 1997 Mr. Yuk and the other petitioners were permitted to leave Cambodia for their trip to the United States. In July 1997, while petitioners were still in the United States, Hun Sen staged a bloody coup, forcing Prince Ranariddh and members of the FUNCINPEC Party to flee the country. There was evidence that a number of FUNCINPEC officials were killed during the violent coup, and that a number of other FUNCINPEC officials disappeared. Mr. Yuk stated that he feared that he could not return to Cambodia following the coup because he had been a high-ranking member of the FUNCINPEC Party, that his immediate supervisor had fled Cambodia and that his "mentor" had been killed by Hun Sen. In his addendum to his asylum application, Mr. Yuk stated:

> I fear that I may be killed or jailed if I return to my country because I am a colonel in the Cambodian National Police, in charge of the National Police Training academy in the capitol city, Phnom Penh, and a member and officer of the FUNCINPEC Party. Relatives have written to me warning me not to come back.

Addendum at 1, Admin. R. at 351. Mr. Yuk also stated that his house and other possessions were seized by the CPP. He testified that CPP members had told his children who remained in Cambodia that if he returned to Cambodia, he would be killed. The record includes two letters from relatives in Cambodia urging him to remain in the United States because they feared for his safety if he returned.

He further asserted that his son, Hangseyha, had also been a member of FUNCINPEC and was caught in 1985 delivering messages about the CPP's efforts

to learn about FUNCINPEC. Mr. Yuk stated that after this he did not see his son for a year, at which time the Cambodian police told him that Hangseyha was in jail, that he would die soon, and that Mr. Yuk and his family needed to see him soon if they wished to see him before he died. Mr. Yuk alleged that when they saw Hangseyha in jail, there was evidence that he had been tortured, and when he died, the family was not allowed to have a ceremony for him because they were told he had been a traitor. Mr. Yuk alleged that his son-in-law, Mr. Nhim, was equally in danger because of his activities with and membership in the FUNCINPEC Party.

Mr. Yuk provided documents showing his employment at the National Police Academy and his membership in the FUNCINPEC party. He also provided an affidavit from Thomas Filby Jurvic, a United States citizen who met the Yuk family while he was working in Cambodia. Mr. Jurvic stated that he feared both Mr. Yuk and Mr. Nhim would be in danger of being killed or imprisoned if they returned to Cambodia because of their high rank in the Cambodian civil national police force and their membership in and activities with the FUNCINPEC Party. He noted "the conflict between the two parties, FUNCINPEC and Hun Sen's CPP" and further stated he had "heard reports or rumors of Hun Sen's belligerent attitude towards FUNCINPEC." Jurvic Aff. at ¶ 12, Admin. R. at 376.

Mr. Nhim filed a separate asylum application, largely asserting the same claims as Mr. Yuk, averring that he was a major in the National Police and an active member in the FUNCINPEC party. He stated his belief that he would be imprisoned or killed because of his activities with FUNCINPEC intelligence, the National Police and his association with his father-in-law, Mr. Yuk. Mr. Nhim also testified that his house and possessions had been seized following the July 1997 coup.

Ms. Hang Yuk, Mr. Yuk's adult unmarried daughter, also filed a separate asylum application, based upon the activities and affiliations of her father and Mr. Nhim. As indicated, the applications of the remaining petitioners, Ms. Keth and Ms. Korng, depend upon the facts and allegations of their husbands, Mr. Yuk and Mr. Nhim.

On June 30, 1999, a merits hearing was held before the IJ. Mr. Yuk and Mr. Nhim, represented by counsel, testified consistently with their asylum applications. At the completion of the hearing, the IJ issued an oral decision denying petitioners' applications for asylum, for withholding of removal and for protection under the Convention Against Torture. He concluded they had not proven past persecution, and, to the extent they argued they became refugees by virtue of the 1997 coup, he determined that conditions in Cambodia had changed

so that petitioners did not have a well-founded fear of future persecution should they return to Cambodia.

More specifically, the IJ concluded that Mr. Yuk was not a refugee when he left Cambodia:

> He was only coming to the United States as a visitor. He had a good job when he left. He was the head of the National Police Academy when he left. He had a good living. And the fact that he and his family were allowed to come here to visit shows that he was well regarded by the government.

Oral Decision of the IJ at 4, Admin. R. at 94. The IJ then considered petitioners' claim that they became refugees in the summer of 1997 when Hun Sen staged the coup and some members of the FUNCINPEC Party were executed and others fled the country.

Relying particularly upon the 1998 Country Report from the State Department, the IJ noted that, since 1997, there had been another election in Cambodia, in which the CPP won a plurality, not a majority, and resulting in a new coalition government. Hun Sen was the Prime Minister at that time and Prince Ranariddh of petitioners' FUNCINPEC Party was the President of the National Assembly. The State Department Report further showed that, while a number of opposition leaders left the country after the recent election, most had returned. It also showed there were no political prisoners in Cambodia and that of the forty-nine killings reported in connection with the most recent election, few

if any were of FUNCINPEC members because of that affiliation. The IJ also indicated that the Report showed that "the government does not coerce or forbid membership in political organizations systematically," and "that the United Nations still is supervising the elections and human rights in the country." Id. at 7, Admin R. at 97.[5]

The IJ summarized his findings as follows:

[M]y finding is that the respondent, the principal respondent has not shown a well-founded fear of persecution in the future. He asserts that he became a refugee due to changes in the country after he left routinely. But changes occurred again, which I believe indicate that he will not be persecuted if he returns. It is noted that his political party shares power with the Communist Party and in fact, the two highest ranking officials in the country now other than the king, are the Prince, who represents respondent's party and the official of the Communist Party. They share that power. His party received 31% of the vote at the last election. The record shows there are no political prisoners in that country. There was election violence, but all of those killings have been explained in the State Department Report and very few of them involved attacks on FUNCINPEC members.

. . . [I]n 1998, just a few months ago, many party members who are higher ranking than him, returned to country voluntarily to assume their positions. And the leader of the party, in effect, the Prince, returned. This indicates to me that it is safe to return and that the government is honoring its commitment to have power sharing.

---

[5]The IJ did acknowledge, however, that the Report indicated that "there were credible reports that government officials used intimidation and threats to force FUNCINPEC . . . members to sign oaths of loyalty to the CPP and vote for the CPP in the July elections." Admin. R. at 234.

Id. at 8-9, Admin. R. at 98-99. The IJ accordingly denied petitioners'

applications for asylum and for withholding of removal and for relief under the

Convention Against Torture. The BIA summarily affirmed that decision, without

an opinion, pursuant to the new streamlining regulations permitting such summary

affirmances by a single member of the BIA.

Petitioners appeal, arguing (1) the BIA violated their due process rights and

principles of administrative law by issuing a decision without an opinion and

without articulating any reasons for upholding the IJ's decision;[6] (2) the IJ and

the BIA erred in finding that petitioners had not suffered past persecution; and (3)

the IJ and BIA erred in finding that conditions in Cambodia had changed

sufficiently such that petitioners did not have a well-founded fear of persecution

upon their return to Cambodia.

**DISCUSSION**

**I. Streamlining Regulations and Due Process**

An INS (now USCIS) regulation permits a single member of the BIA to:

> affirm the decision of the Service or the Immigration Judge, without
> opinion, if the Board Member determines that the result reached in
> the decision under review was correct; that any errors in the decision
> under review were harmless or nonmaterial; and that

---

[6]The American Immigration Law Foundation has filed an amicus brief on this issue, in support of petitioners.

-11-

(A) the issue on appeal is squarely controlled by existing Board or federal court precedent and does not involve the application of precedent to a novel fact situation; or
(B) the factual and legal questions raised on appeal are so insubstantial that three-Member review is not warranted.

8 C.F.R. § 3.1(a)(7)(ii) (now codified at 8 C.F.R. § 1003.1(a)(7) (2003)). Once the Board Member makes that determination, "the Board shall issue an order that reads as follows: 'The Board affirms, without opinion, the result of the decision below. The decision below is, therefore, the final agency determination. *See* 8 CFR 3.1(a)(7).'" 8 C.F.R. § 3.1(a)(7)(iii). The regulation goes on to state:

An order affirming without opinion, issued under authority of this provision, shall not include further explanation or reasoning. Such an order approves the result reached in the decision below; it does not necessarily imply approval of all of the reasoning of that decision, but does signify the Board's conclusion that any errors in the decision of the Immigration Judge or the Service were harmless or nonmaterial.

Id.

This provision, part of the "streamlining regulations" originally promulgated in 1999, was initially used sparingly. Its use increased dramatically since early in 2002, in an effort to reduce the backlog of cases pending before the BIA. A single member of the BIA invoked this regulation to summarily affirm, without opinion, the IJ's denial of petitioners' applications. Petitioners argue that this summary affirmance procedure violates both administrative law and their due process rights. We disagree.

-12-

Petitioners allege the summary affirmance violates principles of administrative law because (1) it is only available if a case meets the regulatory criteria, but, because the BIA member is prohibited from explaining his decision, it is impossible to tell whether the member adhered to the regulation in deciding to use the summary affirmance procedure; (2) it violates the principle that litigants are entitled to an explanation of the reasons for a decision, discourages thoughtful decisionmaking, prevents litigants from being assured of an individualized review of their case based upon the evidence presented, prevents effective appellate review of the ruling, and allows the final agency decisionmaker, the BIA, to issue its final decision without explanation. They argue it violates principles of due process because it deprives them of their due process right to an individualized and meaningful review of their case.

A number of other circuit courts have recently addressed this argument. All have upheld the summary affirmance regulations against challenges that they violate principles of administrative law and/or due process. See Dia v. Ashcroft, No. 02-2460, 2003 WL 22998113 (3rd Cir. Dec. 22, 2003) (en banc); Denko v. INS, No. 02-3746, 2003 WL 22879815 (6th Cir. Dec. 8, 2003); Falcon Carriche v. Ashcroft, 2003 WL 22770121 (9th Cir. Nov. 24, 2003); Georgis v. Ashcroft, 328 F.3d 962 (7th Cir. 2003); Mendoza v. U. S. Att'y Gen., 327 F.3d 1283 (11th Cir. 2003); Soadjede v. Ashcroft, 324 F.3d 830 (5th Cir. 2003); Albathani v. INS, 318

F.3d 365 (1st Cir. 2003). The Fourth Circuit has rejected due process challenges to the summary affirmance procedure in a series of unpublished opinions. See, e.g., Wibowo v. Ashcroft, 75 Fed. Appx. 161, 2003 WL 22119933 (4th Cir. Sept.15, 2003); Zengui Goma v. Ashcroft, 71 Fed. Appx. 263, 2003 WL 21961985 (4th Cir. Aug. 19, 2003); cf. Dominguez v. Ashcroft, 336 F.3d 678, 680 (8th Cir. 2003) (citing Albathani in rejecting an argument that the BIA abused its discretion in summarily affirming the IJ's decision). We join those circuits and uphold the validity of those regulations.

Albathani was the first decision to address this issue, and its analysis has been widely followed. See, e.g., Falcon Carriche, 2003 WL 22770121, at *3 (holding that Albathani's "careful reasoning is persuasive and, like the other courts of appeal that followed, we embrace its rationale"); Mendoza, 327 F.3d at 1288 (agreeing with Albathani's analysis); Soadjede, 324 F.3d at 832 (same). We generally follow it as well.

The Albathani court began by noting that "[a]n alien has no constitutional right to any administrative appeal at all." 318 F.3d at 376 (citing Abney v. United States, 431 U.S. 651, 656 (1977) (holding there is no constitutional right to appeal in criminal cases)). Thus, "[s]uch administrative appeal rights as exist are created by regulations promulgated by the Attorney General." Id. at 376 (citing 8 C.F.R. § 3.1(b) (2002)). Accordingly, the INS had the power to promulgate the summary

-14-

affirmance regulations and include therein the procedures it deemed appropriate. See Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc., 435 U.S. 519, 543 (1978) ("[A]dministrative agencies should be free to fashion their own rules of procedure and to pursue methods of inquiry capable of permitting them to discharge their multitudinous duties.") (internal quotation marks omitted); Dia, 2003 WL 22998113 at *4 (noting that the Vermont Yankee's "'basic tenet of administrative law' has even more force in the immigration contest where our deference is especially great." (internal citation omitted).

Petitioner and amici argue, as they did in Albathani, that the BIA's decision is the final agency decision, that a summary affirmance without opinion by the BIA does not provide a reasoned basis for review, and that the summary affirmance without explanation prevents courts from determining whether the BIA is following the regulation. We disagree.

First, the summary affirmance regulations specifically provide that the IJ's decision is the final agency action. The IJ's decision contains a reasoned explanation for the result reached. That is permissible. In support of their argument that the BIA's decision, not the IJ's decision being reviewed, must contain a reasoned explanation, petitioners and amici rely on the following passage from SEC v. Chenery Corp., 332 U.S. 194 (1947):

> If the administrative action is to be tested by the basis upon which it purports to rest, that basis must be set forth with such clarity as to be

-15-

understandable.  It will not do for a court to be compelled to guess at the theory underlying the agency's action; nor can a court be expected to chisel that which must be precise from what the agency has left vague and indecisive.

Id. at 196-97.  As the First Circuit observed, petitioners and amici

overlook the plain language of Chenery, which refers to *agencies* in their entirety, not individual components of agencies.  Here, the relevant agency – the INS – has presented a statement of reasons for its decision, albeit from the IJ rather than the BIA.  Chenery does not require that this statement come from the BIA rather than the IJ.

Albathani, 318 F.3d at 377; see also Dia, 2003 WL 22998113 at *7.  Thus, there is nothing improper under Chenery in making the IJ's decision the final agency decision.

Furthermore, as our circuit and many others have previously held, the BIA may adopt an IJ's opinion without further analysis.  See Panrit v. INS, 19 F.3d 544, 546 (10th Cir. 1994) ("We . . . hold that where the Board explicitly recites that it has reviewed the record and the immigration judge's decision and that it is content to rest its decision on the immigration judge's reasoning, adoption of the immigration judge's decision does not present any difficulty in terms of the sufficiency of the Board's articulation of its reasoning."); see also Chen v. INS, 87 F.3d 5, 8 (1st Cir. 1996) ("[W]e join eight of our sister circuits in ruling that the Board need not write at length merely to repeat the IJ's findings of fact and his reasons for denying the requested relief, but, rather, having given individualized consideration to a particular case, may simply state that it affirms

the IJ's decision for the reasons set forth in that decision.") (listing cases). In that situation, we effectively review the IJ's decision, just as we do under the streamlining summary affirmance regulations.

Petitioners and amici respond that the summary affirmance without opinion procedure creates a particular and unique problem because, unlike an affirmance expressly adopting the IJ's decision, as in Panrit and similar cases, the summary affirmance permits an affirmance even if the BIA disagrees with the IJ's reasoning. This is possible because, as the regulation expressly states, the summary affirmance is only of the "result" of the IJ's decision, not necessarily its reasoning. Thus, a reviewing court may not in fact know the basis for the BIA's decision affirming the IJ.

While noting the problem, the First Circuit stated that it does "not render the scheme a violation of due process or render judicial review impossible" because "courts will continue to have the IJ's decision and the record upon which it is based available for review." Albathani, 318 F.3d at 377-78. Courts will therefore still be able to "carry out an intelligent review." Id. at 378; see also Denko, 2003 WL 22879815, at *8 ("[Petitioner's] argument that the summary affirmance without opinion permitted by § 1003.1(a)(7) [formerly § 3.1(a)(7)] violates the mandate that agencies must set forth reasons for their decisions also fails because the IJ's opinion becomes the reasoned explanation needed for

-17-

review."); Falcon Carriche, 2003 WL 22770121, at *4 ("[T]he streamlining procedures do not compromise our ability to review the INS's decision . . . because we can review the IJ's decision directly."); Georgis, 328 F.3d at 967 ("Since we review directly the decision of the IJ when a case comes to us from the BIA pursuant to § 1003.1(a)(7), our ability to conduct a full and fair appraisal of the petitioner's case is not compromised, and the petitioner's due process rights are not violated."). As the Third Circuit recently stated en banc, "[a]ll that is required for our meaningful review is that the agency—as represented by an opinion of the BIA or IJ—put forth a sufficiently reasoned opinion." Dia, 2003 WL 22998113 at *9.

Additionally, as a practical matter, "if the BIA does not independently state a correct ground for affirmance in a case in which the reasoning proffered by the IJ is faulty, the BIA risks reversal on appeal." Albathani, 318 F. 3d at 378. Thus, there would be little incentive for the BIA to summarily affirm without an opinion the result of an IJ's decision if it did not also agree with the IJ's reasoning. See Falcon Carriche, 2003 WL 22770121, at *4 ("Although the streamlining procedures allow a board member to affirm the IJ's decision based on different reasons than those set forth by the IJ, the BIA is cognizant of this possibility and knows the risk it takes in declining to articulate a different or alternate basis for the decision."). In sum, the IJ's decision provides the reasoned explanation for

the agency's decision, its existence enables us to review the agency decision, and the BIA knows that faulty or inadequate reasoning in the IJ's decision will lead to the reversal of a BIA summary affirmance of that decision.

Petitioners also make a variety of arguments to the effect that the lack of explanation by the BIA member means that we cannot tell whether the member properly followed the regulation in summarily affirming the IJ's decision and we cannot tell if the BIA member conducted the kind of careful review he or she should. They argue that this problem is particularly acute because of statistics suggesting that, in some instances, BIA members appear to spend as little as ten to fifteen minutes per case. As the First Circuit acknowledged, this is a "serious argument . . . that the very nature of the one-line summary affirmance may mean that BIA members are not in fact engaged in the review required by regulation and courts will not be able to tell." Albathani, 318 F.3d at 378.

The First Circuit's response to this argument was that there was no reason in the case before it to suspect that the BIA member had not done his job properly, as "[t]here was a basis for affirmance and for summary affirmance." Id. Moreover, there was no "evidence of systemic violation by the BIA of its regulations." Id. Given that lack of evidence, the court was unwilling "to infer from these numbers alone that the required review is not taking place." Id. at 379; see also Denko, 2003 WL 22879815, at *7 ("We will not assume such a

complete break-down in the system in the absence of tangible evidence to support such a conclusion."); Mendoza, 327 F.3d at 1289 ("That a one-sentence order was entered is no evidence that the BIA member did not review the facts of Mendoza's case."). We agree with that analysis. In view of the presumption of regularity attaching to administrative procedures, see Bar MK Ranches v. Yuetter, 994 F.2d 735, 740 (10th Cir. 1993), we will not assume, without any evidence, that BIA members do not follow the regulations or do not perform their jobs properly. Indeed, as the First Circuit noted, a BIA summary affirmance is not unlike the summary affirmance or summary disposition procedures employed by courts, which are "workload management devices that acknowledge the reality of high caseloads. They do not, either alone or in combination with caseload statistics, establish that the required review is not taking place." Albathani, 318 F.3d at 378. In short, petitioners received a meaningful and thorough review of their claims, and, in the IJ's decision, they received a reasoned explanation for the agency's decision, which we can, in turn, review. Due process and principles of administrative law require nothing more.

We therefore agree with the analysis of <u>Albathani</u> and those other courts and join them in holding that the summary affirmance procedures do not violate principles of administrative law or due process.[7]

## II. Asylum

"A request for asylum involves a two-step process. First, the applicant has the burden to prove his or her statutory eligibility for asylum by establishing that he or she is a 'refugee.'" <u>Krastev v. INS</u>, 292 F.3d 1268, 1270 (10th Cir. 2002) (citing <u>Woldemeskel v. INS</u>, 257 F.3d 1185, 1188 (10th Cir. 2001)). By statute, a "refugee" is any person who is outside the country of his or her nationality "who

---

[7]The government also argues that we lack "jurisdiction" over the BIA's decision to apply 8 C.F.R. § 3.1(a)(7) to this particular case because that is a decision committed to the complete discretion of the BIA and such discretionary decisions are unreviewable.

We need not address this issue, because petitioners make no serious or developed argument that the decision to streamline their case was wrong. <u>See</u> <u>Mendoza</u>, 327 F.3d at 1288 n.7 ("We need not address the INS's contention [that we cannot review the discretionary decision whether to streamline a particular case] . . . because [petitioner] does not challenge the INS's decision to streamline his appeal."); <u>cf.</u> <u>Denko</u>, 2003 WL 22879815 at *10 (assuming, without deciding, "that judicial review properly is employed to assess whether the BIA correctly designated a case for summary affirmance"); <u>Falcon Carriche</u>, 2003 WL 22770121, at *6 ("[W]e do not embrace the government's argument that the streamlining decision is inherently discretionary."); <u>Georgis</u>, 328 F.3d at 967 (noting that for many streamlined cases "it makes no practical difference whether the BIA properly or improperly streamlined review of [a petitioner's] case," because when "we review directly the decision of the IJ when a case comes to us from the BIA pursuant to [§ 3.1(a)(7)], our ability to conduct a full and fair appraisal of [his] case is not compromised").

-21-

is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A).

An applicant for asylum can demonstrate refugee status in three ways. "One way is by showing he or she has a 'well-founded fear of [future] persecution.'" Krastev, 292 F.3d at 1270 (quoting 8 C.F.R. § 208.13(b)(2)). A second way to establish refugee status is to demonstrate "that he or she has suffered past persecution, which gives rise to a presumption that he or she has a well-founded fear of future persecution unless the INS rebuts the presumption by a preponderance of the evidence." Id. at 1270-71. The third way to establish status as a refugee is to establish past persecution so severe that it demonstrates "compelling reasons for being unwilling" to return." 8 C.F.R. § 208.13(b)(1)(ii) (2000);(current version at 8 C.F.R. § 208.13(b)(1)(iii)(A)). This is known as "humanitarian" asylum. If an applicant establishes his or her refugee status and consequent eligibility for asylum, "the Attorney General exercises discretionary judgment in either granting or denying asylum." Krastev, 292 F.3d at 1271; see also Woldemeskel, 257 F.3d at 1189.

We have noted that persecution requires the "'infliction of suffering or harm upon those who differ (in race, religion, or political opinion) in a way

-22-

regarded as offensive' and requires 'more than just restrictions or threats to life and liberty.'" Woldemeskel, 257 F.3d at 1188 (quoting Baka v. INS, 963 F.2d 1376, 1379 (10th Cir. 1992)). A claim based upon a well-founded fear of future persecution includes "both a subjective and an objective component." Id. First, the applicant must demonstrate an objective basis by "'credible, direct, and specific evidence in the record, of facts that would support a reasonable fear that the petitioner faces persecution.'" Id. (quoting Kapcia v. INS, 944 F.2d 702, 706-07 (10th Cir. 1991)) (further quotation omitted); see also 8 C.F.R. § 208.13(b)(2)(i)(B) (applicant must show a "reasonable possibility" of future persecution). Once an objective basis is shown, the applicant must show that his or her subjective fear is genuine. Woldemeskel, 257 F.3d at 1189.

We review the IJ's resolution of the initial refugee status question under a substantial evidence standard. "The BIA's determination that [the applicant is] not eligible for asylum must be upheld if 'supported by reasonable, substantial, and probative evidence on the record considered as a whole.' It can be reversed only if the evidence presented by [the applicant] was such that a reasonable factfinder would have to conclude that the requisite fear of persecution existed." INS v. Elias-Zacarias, 502 U.S. 478, 481 (1992) (citation omitted) (quoting 8 U.S.C. § 1105a(a)(4)). We do not "'weigh the evidence or . . . evaluate the witnesses' credibility.'" Woldemeskel, 257 F.3d at 1189 (quoting Kapcia, 944

F.2d at 707) (internal quotation marks omitted)). "The BIA's findings of fact are conclusive unless the record demonstrates that '"any reasonable adjudicator would be compelled to conclude to the contrary."'" <u>Tsevegmid v. Ashcroft</u>, 336 F.3d 1231, 1235 (10th Cir. 2003) (quoting <u>Fahim v. U.S. Att'y Gen.</u>, 278 F.3d 1216, 1218 (11th Cir. 2002) (quoting 8 U.S.C. § 1252(b)(4)(A)-(B))).

The IJ concluded petitioners failed to show that they had been the victims of past persecution, nor did they have a well-founded fear of future persecution.

## A. Past persecution

Petitioners allege they have suffered past persecution in the form of the detention, torture and death of Mr. Yuk's son in 1985; threats made against Mr. Yuk's life; and the confiscation of his house and possessions, as well as Mr. Nhim's house and possessions, following their departure from Cambodia. In finding that petitioners were not refugees at the time they left to visit the United States in 1997, the IJ implicitly concluded they had failed to demonstrate past persecution. This conclusion is supported by substantial evidence.

While the detention, torture and death of Mr. Yuk's son in 1985 is indisputably tragic, the fact remains that petitioners stayed in Cambodia for twelve years after that, during which time Mr. Yuk's activities on behalf of FUNCINPEC became more visible and open. During this time, Mr. Yuk

supported his family and provided a comfortable living, even a relatively high standard of living by Cambodian standards. See Jurvic Aff. ¶ 8, Admin. R. at 374.[8] They present no evidence of other reprisals in connection with the death of Mr. Yuk's son. Other family members of the Yuks remain in Cambodia, apparently without experiencing any persecution.

Mr. Yuk relayed an incident around the time of the 1993 election in which he was threatened by a man who stated that had he known Mr. Yuk was a member of FUNCINPEC, he would have had him killed. It is not clear whether that was a contemporaneous threat, and, in any event, Mr. Yuk remained in Cambodia for four more years after that without other specific threats to his life.[9] "Threats

---

[8]Jurvic stated:

> I am not completely familiar with the military and police organization in Cambodia, but particularly, Horn Yuk appeared to have a very high position. His home is very large and nice in comparison to homes in Cambodia. It is a two story structure with electricity and indoor running water. He also had a car, which is quite unusual in Cambodia, and although I cannot recall the make or model of his car, it was a nice late model car.

Jurvic Aff. ¶ 8, Admin. R. at 374.

[9]Petitioners cite two letters, one from Mr. Yuk's son and one from his brother-in-law, both of whom still live in Cambodia, which they assert show that an arrest warrant awaits Mr. Yuk should he return to Cambodia. One letter states that "some troops from C.P.P. came by to your home; looking for you, to arrest you, I think." Admin. R. at 382 (emphasis added). The other expresses the opinion that "[t]hey will arrest or kill you right a way!" Id. at 384. Neither letter states that there is an arrest warrant for Mr. Yuk, let alone provides us with any

(continued...)

alone generally do not constitute persecution; only rarely, when they are so immediate and menacing as to cause significant suffering or harm in themselves, do threats per se qualify as persecution." Vatulev v. Ashcroft, No. 02-9573, 2003 WL 23098615, at *2 (10th Cir., Dec. 31, 2003).

Finally, Mr. Yuk and Mr. Nhim relate that their houses and possessions were confiscated after they left Cambodia for the United States. Although Mr. Yuk testified that CPP members currently reside in his house, it is not clear from the record exactly why their houses were confiscated. It is not clear whether Mr. Nhim owned his house, or whether it belonged to the FUNCINPEC Party.[10] Thus, it is unclear whether it was taken specifically from Mr. Nhim once he left the country, or whether it was taken as part of FUNCINPEC's properties.

---

[9](...continued)
actual evidence that Mr. Yuk is in fact at risk of arrest should he return to Cambodia.

[10]The following exchange occurred between petitioners' counsel and Mr. Nhim at the hearing before the IJ:

Q. You mentioned that your house was taken. Do you know who took your house in Cambodia?
A. It's included in the FUNCINPEC properties and the FUNCINPEC organization.
Q. So does FUNCINPEC or does Hunsen's people own the home?
A. Hunsen's party who took it from me.

Admin. R. at 160-61.

In short, substantial evidence supports the conclusion that petitioners had not suffered past persecution.

**B. Well-founded fear of future persecution**

The IJ found that petitioners had not established a well-founded fear of future persecution. While noting the events surrounding the 1997 coup, the IJ determined that conditions had changed subsequent to that coup, including the existence of a new coalition government with a FUNCINPEC presence following elections in 1998. In so concluding, the IJ relied primarily on the 1997 and 1998 State Department Country Conditions Reports.

The 1997 Report documented the violence that occurred in connection with the 1997 coup, including the killing of forty-one FUNCINPEC officials and up to twenty-two FUNCINPEC soldiers. The Report also indicated, however, that "[t]here was no evidence to indicate a systematic countrywide government campaign to purge political or military officials." Admin. R. at 171. The IJ then considered the 1998 Report, which observed that the July 1998 elections, in which 93% of the eligible electorate voted, resulted in the CPP receiving 41.1% of the vote, FUNCINPEC 31.7% of the vote and the Sam Rainsy Party 14.3%, and, according to the Report, reflected the will of the electorate. The Report also stated that "most international observer groups certified the election as

acceptable."[11] A new coalition government was formed, with Hun Sen as Prime Minister and Prince Ranariddh as President of the National Assembly. The Report further observed that while "[t]he Government does not coerce or forbid membership in political organizations systematically . . . there were credible reports that government officials used intimidation and threats to force FUNCINPEC and Sam Rainsy Party members to sign oaths of loyalty to the CPP and vote for the CPP in the July elections." Admin. R. at 234. As the IJ noted, Prince Ranariddh and other FUNCINPEC officials who had fled the country had returned, with the Prince assuming a significant post in the coalition government. Furthermore, there is no indication that petitioners would be at any heightened risk compared to other FUNCINPEC members, or that they would be singled out for persecution, should they return to Cambodia. While "unfulfilled threats are . . . properly considered in determining whether a petitioner has a reasonable fear of future persecution," Vatulev, 2003 WL 23098615, at *2, the threat against Mr. Yuk in 1993 is less persuasive because "the sheer length of time—nearly ten years—that has passed since receipt of that threat diminishes its present

_____

[11]The page where this quotation appears in the 1998 Country Report is missing from the administrative record. The Report is easily available, however, on the State Department's website. Although we review the record as it was before the IJ, and this page was apparently missing from the record before the IJ, this page does not undermine the IJ's conclusions; rather, it supports them. In any event, there is substantial other evidence in the record supporting the IJ's decision.

significance." Id.  Other evidence of a danger to Mr. Yuk should he return to Cambodia is somewhat vague and conclusory.

Petitioners argue that the IJ erred in placing such reliance on State Department Reports, and that he ignored other evidence, in particular:  (1) a statement by Lorne Craner, President of the International Republican Institute who stated that the 1998 Cambodian election was "among the worst we have observed since 1993,"  Admin. R. at 198; (2) the Senate Committee testimony of Sichan Siv, to the effect that the coalition was a facade, id. at 215; and (3) a House of Representatives Resolution in 1998 calling for "Hun Sen and his henchmen to stand before an international tribunal to be held accountable for their many atrocities."  Id. at 213.

First, there was nothing improper in the IJ's reliance on the State Department Reports.  "[A] state department report on country conditions may be probative in a well-founded fear case."  Krastev, 292 F.3d at 1276-77; see also Lal v. INS, 255 F.3d 998, 1023 (9th Cir.) ("Our case law well establishes that the country report from our Department of State is the most appropriate and perhaps best resource, for determining country conditions." (internal quotations omitted)), amended by, 268 F.3d 1148 (9th Cir. 2001); Kayembe v. Ashcroft, 334 F.3d 231, 235 (3d Cir. 2003) ("[T]he Country Report potentially constitutes substantial evidence to support the BIA's finding."); Koliada v INS, 259 F.3d 482, 487 (6th

Cir. 2001) ("Other circuits have held that State Department reports on other countries are entitled to significant deference when assessing conditions there."); Gonahasa v. INS, 181 F.3d 538, 542 (4th Cir. 1999) ("A State Department report on country conditions is highly probative evidence in a well-founded fear case.").[12]  Thus, a State Department Report can constitute substantial evidence supporting the IJ's decision.

Second, while there was other evidence, including the three items upon which petitioners place particular reliance, contradicting some aspects of the State Department Report, it is not our prerogative to reweigh the evidence, but only to decide if substantial evidence supports the IJ's decision.  We only determine whether a reasonable factfinder could find that petitioners do not have a well-founded fear of persecution.  Indeed, we only reverse that finding if "any reasonable adjudicator would be compelled to conclude to the contrary." Tsevegmid, 336 F.3d at 1235 (internal quotation marks omitted).  Moreover, we have no reason to believe that these pieces of evidence are more accurate than the State Department Report.  We hold that the IJ's decision is supported by substantial evidence in the record.

---

[12]We noted in Krastev, however, that the use of a State Department Report "does not substitute for an analysis of the facts of each applicant's individual circumstances."  Krastev, 292 F.3d at 1277 (internal quotation marks omitted).

**III. Withholding of Removal and Convention Against Torture**

An applicant is entitled to withholding of removal if he or she can show a "clear probability of persecution" which courts have acknowledged is a higher standard than that for asylum. See Krastev, 292 F.3d at 1271. Because petitioners failed to meet the lower standard of showing entitlement to asylum, the IJ correctly denied their application for withholding of removal. Petitioners also failed to establish the requisite likelihood of being tortured so as to entitle them to relief under the Convention Against Torture.

**CONCLUSION**

For the foregoing reasons, we AFFIRM the BIA and IJ's decision denying petitioners applications for asylum, withholding of removal and for relief under the Convention Against Torture.