**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**June 29, 2005**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

NAHASHON CHEGE WAMBUGU,

Petitioner,

v.

ALBERTO R. GONZALES, Attorney
General, *

Respondent.

No. 04-9564
(No. A95-896-528)
(Petition for Review)

---

**ORDER AND JUDGMENT** **

---

Before **BRISCOE** , **ANDERSON** , and **BRORBY** , Circuit Judges.

---

After examining the briefs and appellate record, this panel has determined

unanimously to grant the parties' request for a decision on the briefs without oral

---

\* On February 4, 2005, Alberto R. Gonzales became the United States
Attorney General. In accordance with Rule 43(c)(2) of the Federal Rules of
Appellate Procedure, Mr. Gonzales is substituted for John Ashcroft as the
Respondent in this action.

\*\* This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel. The court
generally disfavors the citation of orders and judgments; nevertheless, an order
and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument.

Petitioner Nahashon Chege Wambugu, a citizen of Kenya, petitions for review of a final order of removal issued by the Board of Immigration Appeals (BIA). Specifically, Mr. Wambugu seeks review of the decision of the Immigration Judge (IJ) that denied his application for asylum based on a finding that he is not a refugee under 8 U.S.C. § 1101(a)(42)(A). [1] Exercising jurisdiction under 8 U.S.C. § 1252(a)(1) (authority to review final orders of removal), and 8 U.S.C. § 1252(a)(2)(B)(ii) (permitting review of decision on asylum claims), we deny the petition for review. [2]

---

[1] Mr. Wambugu also seeks review of the portion of the IJ's decision that granted him voluntary departure in lieu of removal under 8 U.S.C. § 1229c(b) contingent upon the timely payment of a voluntary departure bond in the amount of $7,500. *See* Admin. R. at 64-65. Because this court does not have jurisdiction to review a "judgment regarding the granting of relief under section . . . 1229c," 8 U.S.C. § 1252(a)(2)(B)(i), we do not have jurisdiction to review Mr. Wambugu's challenge to the bond, *cf. Ngarurih v. Ashcroft*, 371 F.3d 182, 193 (4th Cir. 2004) (holding that § 1252(a)(2)(B)(i) deprived court of jurisdiction to entertain request to reinstate grant of voluntary departure).

[2] The IJ also denied Mr. Wambugu's applications for withholding of removal under 8 U.S.C. § 1231(b)(3) and the Convention Against Torture, *see* 8 C.F.R. § 208.16(c). In his opening brief, Mr. Wambugu has not made any arguments challenging the denial of his applications for withholding of removal. As a result, he has waived all issues relating to those applications. *See Krastev v. INS*, 292 F.3d 1268, 1280 (10th Cir. 2002).

**I.**

In his oral decision, the IJ did not question the credibility of Mr. Wambugu's allegations concerning his experiences in Kenya. In the statement of facts in his opening brief, Mr. Wambugu summarized those experiences as follows:

> Wambugu is a native and citizen of Kenya who entered the United States on a tourist visa in July of 2001. Wambugu was born in and raised in the Central Province of Kenya, which is primarily populated by members of the Kikuyu tribe of which he was a member. He lived in this tribal homeland until approximately 1976 when he was eighteen years old. Wambugu is a member of the "upcountry" people and a political supporter of the Democratic Party. Wambugu has been married since 1980 to a Kenyan national and has six children through this marriage. His wife and children are currently residing in Kenya.
>
> In 1976 Wambugu moved to [the Island of Mombasa], located in the Coast[] Province [of Kenya] and began employment as a laborer. In 1990, he opened a store selling sewing wool in [the City of] Wundanyi in the Coast[] Province. Wambugu's persecution in Kenya began in 1992 when [the first multi-party] elections took place in Kenya and the [Kenyan African National Union (KANU)] party came to power. In March or April of 1993, Wambugu was driven out of Wundanyi [and he returned] to [Mombasa] due to threats of violence and the destruction of businesses belonging to non-Wundanyi natives. . . .
>
> In January of 1995, Wambugu purchased a plot of land [on the Island of Mombasa] in Katisha and opened a second store a few miles from his first store in Kamachio. His father and brother lived in this second location while Wambugu and his family stayed in Kamachio, both on [Mombasa] Island. In 1997 national elections were slated and the KANU party instigated tribal clashes designed to drive out "upcountry" tribesman from [Mombasa] in order to win regional elections. On September 22, 1997, supporters of the KANU

-3-

[known as the Kayabobo tribesmen] attacked Wambugu and his family. He was hospitalized for two months with multiple stab wounds. He was attacked because he was a member of the "upcountry" people in Kenya who was a successful businessman and also because he was assisting the opposition Democratic Party by allowing the DP to use his vehicles to transport its supporters. His Kamachio store and home was destroyed. A few months later on December 20, 1997, [Kayabobo] tribesmen, supporting the KANU, attacked his brother and father at the Katisha store, killing the brother and seriously injuring the father. The father later died of injuries sustained in the attack.

Wambugu buried his father and brother back in their tribal homeland [and] returned to [Mombasa]. . . . In May of 2001 Wambugu received an invitation to speak at a religious convocation in the United States. He entered in July, 2001 and was still in the United States when he spoke to his wife on Christmas Day, 2001. She informed him that businesses [in Mombasa] owned by non-natives were again being targeted for destruction. The Member of the National Parliament, representing the [Mombasa] district, Sharrif Nassir, called for the removal of "upcountry" people from [Mombasa]. Wambugu's store was since looted and his wife fled [and returned to the Central Province of Kenya].

Mungiki tribesmen, loyal to the KANU have entered the Central Province, with the support of the KANU and have engaged in widespread acts of ethnic violence. These acts are well documented in the Record.

Aplt. Opening Br. at 5-7 (citations omitted).

## II.

### A. Standard of Review.

In an oral decision dated March 18, 2003, the IJ found that Mr. Wambugu failed to establish refugee status based on his alleged past persecution or his alleged fear of future persecution, and the IJ therefore denied his application for

-4-

asylum.  In an order dated June 7, 2004, a single member of the BIA summarily affirmed the IJ's decision without an opinion pursuant to 8 C.F.R. § 1003.1(e)(4).  As a result of the BIA's summary affirmance, the IJ's decision became the final agency determination for purposes of appellate review.  *See Alvarez-Delmuro v. Ashcroft*, 360 F.3d 1254, 1255 (10th Cir. 2004).

Because Mr. Wambugu's application was denied "on refugee status, our review is limited, in breadth, to that threshold determination."  *Vatulev v. Ashcroft*, 354 F.3d 1207, 1209 (10th Cir. 2003).  We review the IJ's resolution of Mr. Wambugu's refugee status under a "substantial evidence standard."  *Yuk v. Ashcroft*, 355 F.3d 1222, 1233 (10th Cir. 2004).  Consequently,

> [t]he [IJ's] determination that [Mr. Wambugu is] not eligible for asylum must be upheld if supported by reasonable, substantial, and probative evidence on the record considered as a whole.  It can be reversed only if the evidence presented by [Mr. Wambugu] was such that a reasonable factfinder would have to conclude that the requisite fear of persecution existed.  We do not weigh the evidence or . . . evaluate the witnesses' credibility.  The [IJ's] findings of fact are conclusive unless the record demonstrates that any reasonable adjudicator would be compelled to conclude to the contrary.

*Id.* (quotations omitted).

**B.  Refugee Status.**

"A request for asylum involves a two-step process.  First, the applicant has the burden to prove his or her statutory eligibility for asylum by establishing that he or she is a 'refugee.'"  *Krastev v. INS*, 292 F.3d 1268, 1270 (10th Cir. 2002).

A "refugee" is defined as any person who is outside the country of that person's nationality "who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). We have recognized that "[t]here are essentially three methods by which an applicant can establish his or her status as a refugee." *Krastev*, 292 F.3d at 1270.

> One way is by showing he or she has a well-founded fear of [future] persecution. A second way to establish refugee status is to demonstrate that he or she has suffered past persecution, which gives rise to a presumption that he or she has a well-founded fear of future persecution unless the [government] rebuts the presumption by a preponderance of the evidence. The third way to establish status as a refugee is to establish past persecution so severe that it demonstrates compelling reasons for being unwilling to return. This is known as "humanitarian" asylum.

*Yuk*, 355 F.3d at 1232-33 (quotations omitted). "Once an applicant has established his or her 'refugee' status and thus eligibility for asylum, the Attorney General exercises discretionary judgment in either granting or denying asylum." *Krastev*, 292 F.3d at 1271.

### III.

Mr. Wambugu claims he is entitled to refugee status because he has suffered past persecution in Kenya based on his status as an "upcountry" person

and supporter of the Democratic Party and because he has a well-founded fear of future persecution if he is forced to return to Kenya. In his oral decision, the IJ found that there was insufficient evidence in the administrative record to demonstrate that Mr. Wambugu is entitled to refugee status, and the IJ therefore denied the application for asylum. Having thoroughly reviewed the administrative record, the parties' briefs, and the pertinent legal authorities, we conclude that the IJ's decision is supported by substantial evidence in the record

**A. Past Persecution.**

This court has "noted that persecution requires the infliction of suffering or harm upon those who differ (in race, religion, or political opinion) in a way regarded as offensive and requires more than just restrictions or threats to life and liberty." *Yuk*, 355 F.3d at 1233 (quotations omitted). In addition, the persecution "must be imposed by the government or by groups which the government is unwilling or unable to control." *Vatulev*, 354 F.3d at 1209 (quotation omitted).

Mr. Wambugu's claim of past persecution is based on the events that occurred in 1997 when he was attacked by a gang of Kayabobo tribesmen while he was living in the Coast Province of Kenya. The IJ found, however, that "there is no evidence to corroborate [Mr. Wambugu's] claim that the activities of the so-called Kayabobo gangs were initiated by the government [of Kenya]." Admin. R. at 61; *see also id.* (concluding that "there is no evidence or indication that the

-7-

[Kayabobo gangs were] operating upon the orders or upon the organization of government individuals"). The IJ also found that "[t]here is evidence that the government of Kenya has been attempting to prosecute and control the activities of these criminal gangs." *Id.* Given these findings, the IJ was "unable to find that the violence and loss of property that [Mr. Wambugu] experienced in 1997 . . . was an act of persecution within the contemplation of the Immigration and Nationality Act." *Id.* at 61-62.

The administrative record contains a copy of a report concerning the tribal violence that occurred in the Coast Province in 1997. *Id.* at 278-319. The report is known as the "Akiwumi Report," and it was prepared by a judicial commission appointed by the Kenyan government. *Id.* at 278. In the Akiwumi Report, the judicial commission concluded that the perpetrators of the violence in the Coast Province were discontented youths who belonged to the majority "Digo" tribe, [3] a tribe that was indigenous to the Coast Province. *Id.* at 279-80. The commission also concluded that the violence was primarily the result of perceived economic

---

[3]     We note that, in the Akiwumi Report, the judicial commission does not use the term "Kayabobo" when describing the gangs of Digo youths that were involved in the tribal clashes in the Coast Province in 1997. However, the report does note that Digo "raiders" reportedly used the "Kaya Bombo forest" as a hiding place. *See* Admin. R. at 301. We therefore assume the IJ was referring to members of the Digo tribe when he used the term "Kayabobo" in his decision. *Id.* at 56-57, 61. Likewise, we will assume that Mr. Wambugu is referring to members of the Digo tribe when he uses the term "Kayaboo tribesmen" in his opening brief. *See* Aplt. Opening Br. at 6.

oppression by the non-indigenous and minority "upcountry" tribes in the area, including members of the Kikuyu tribe.   *Id.*  The commission further noted that, because Kenya's next presidential and general elections were to be held at the end of 1997, the ruling KANU party had an incentive to "exploit the existing and latent animosity which the coastal people might have, against the upcountry inhabitants . . ., so that the former [could] intimidate or drive away the latter from voting for the opposition parties."   *Id.*  at 280.

The commission did not conclude that the KANU party or the national government of Kenya was directly involved in the violence that occurred in the Coast Province in 1997, however.  Instead, the commission determined only that certain members of the local police and the provincial administration had aided and abetted and/or been accessories to the violence, and the commission recommended that the identified individuals be further investigated to determine if criminal charges should be brought against them.   *Id.*  at 294-95, 316, 318-19. The commission also noted that, while the local police "failed miserably to prevent or to rapidly stop the clashes, they were able to arrest a large number of people and to charge a substantial number of them in court."   *Id.*  at 319.  The report further indicates that there were no more violent attacks by the Digo youths after June of 1998.   *Id.*  at 304-07.

In light of this evidence, we conclude that there is substantial evidence in the record supporting the IJ's findings that: (1) the violence experienced by Mr. Wambugu in the Coast Province in 1997 was not imposed by the government of Kenya, *id.* at 61; and (2) the government of Kenya has been attempting, and is thus willing, to control the activities of the violent gangs in the Coast Province, *id.* In addition, while the IJ did not make a specific finding to the effect that the government of Kenya was "able" to control the violent gangs in the Coast Province, *see Vatulev*, 354 F.3d at 1209, the record clearly indicates that the government succeeded in quelling the tribal violence in that region. As summarized by the IJ,

> [T]he government had apparently regained control subsequent to this violence in the latter part of 1997 and, by [Mr. Wambugu's] own characterization, his personal situation returned to "normal." He continued to operate his business effectively without interference and without apparent threat up until the time of his departure [to the United States] in July of 2001. The Court would note that there is no indication in [Mr. Wambugu's] testimony, nor in the documentation that [he] has submitted, of additional threats or acts of violence perpetrated against [him]. . . . There is no mention of any subsequent problems, threats, or dangers that existed for [Mr. Wambugu] after [the] 1997 clashes.

Admin. R. at 62.

Because Mr. Wambugu has failed to establish that he was subjected to past persecution in Kenya, we also conclude that there is no basis for granting humanitarian asylum under 8 C.F.R. § 1208.13(b)(1)(iii)(A). Likewise, there is

-10-

no basis for granting humanitarian asylum under § 1208.13(b)(1)(iii)(B), as Mr. Wambugu has failed to establish "a reasonable possibility that he . . . may suffer other serious harm upon removal to [Kenya]," *id.*

**B. Future Persecution.**

To establish a well-founded fear of future persecution, Mr. Wambugu must prove either: (1) that he "would be singled out personally for persecution" if he returned to Kenya; or (2) that he "has a reasonable fear of persecution because of [his] membership in a group subject to a pattern or practice of persecution." *Woldemeskel v. INS*, 257 F.3d 1185, 1190 (10th Cir. 2001) (quotation omitted); *see also* 8 C.F.R. § 1208.13(b)(2)(iii)(A)-(B). "A pattern or practice of persecution has been defined as something on the order of organized or systematic or pervasive persecution." *Id.* at 1191 (quotation omitted). We have also recognized that a claim based on a well-founded fear of future persecution includes "both a subjective and an objective component." *Id.* at 1188. First, the applicant must "prove an objective basis by credible, direct, and specific evidence in the record, of facts that would support a reasonable fear that the petitioner faces persecution." *Id.* (quotations omitted). Second, once an objective basis is shown, "the applicant must show [his] subjective fear is genuine." *Id.* at 1189.

As noted by the IJ, Mr. Wambugu "testified that he is afraid to return to Kenya . . . because of the activities of the Mungiki in the Central Region and

-11-

because of his belief or perception that the KANU government representatives and political party is still strong and poses a danger to him." Admin. R. at 59. In his opening brief, Mr. Wambugu reiterates this argument, claiming that he has "demonstrated the link between the Mungiki . . . tribe[] and the KANU party, which although the minority party, still wields substantial influence in Kenya that the majority party is unable to control." Aplt. Opening Br. at 15-16. Mr. Wambugu has not set forth any specific facts to support this claim, however. Instead, he simply asserts that "[t]he fears that he expressed to the Immigration Judge are consistent with the news reports submitted by Wambugu as well as the current Department of State Country Reports." *Id.* at 16; *see also id.* at 7 (stating that "Mungiki tribesmen, loyal to the KANU have entered the Central Province, with the support of the KANU and have engaged in widespread acts of ethnic violence").

In his decision, the IJ did not make a specific finding to the effect that Mr. Wambugu failed to establish that he had a well-founded fear of future persecution in Kenya. We conclude that the IJ implicitly resolved the future persecution issue, however, and that he did so based on the following analysis:

> [T]he court would also find that in this case there are "changed country conditions." The KANU party, which [Mr. Wambugu] attributes to the instigation of the tribal unrest that resulted in the attack upon him in 1997, is no longer the majority party. The Mungiki are an outlawed criminal gang that the Kenyan government is attempting to control, and [Mr. Wambugu's] political organization,

-12-

the organization that he claims he was affiliated with, is now the majority political party in Kenya and was specifically dominant in the Coastal Region where [Mr. Wambugu] last resided in the last elections.

Admin. R. at 63-64 (citation omitted); *see also id.* at 59-60 (discussing the elections that took place in Kenya in December 2002 and noting that it is "undisputed that the KANU Political Party has been effectively voted out," and that "[t]he current president of Kenya is a . . . representative of the Democratic Party").

The IJ's findings are supported by substantial evidence in the record, and we cannot say that "any reasonable adjudicator would be compelled to conclude to the contrary." *Yuk*, 355 F.3d at 1233 (quotations omitted). To begin with, while the record indicates that "upcountry" businesses in Mombasa were destroyed in late 2001 and early 2002 as part of a government crackdown on street kiosks, *see* Admin. R. at 556, 559, 561-63, 574, the record does not contain any evidence showing that members of "upcountry" tribes have been targeted for persecution in the Coast Province since the elections in December 2002. In fact, according to a report in the record regarding the elections in Kenya in December 2002, "[t]he biggest political changes occurred in Coast Province, formerly a KANU bastion, where the opposition coalition not only won all 4 Mombasa seats but made impressive gains in the rural hinterland." *Id.* at 168; *see also id.* at 166 (stating that the KANU party's "collapse was greatest in Coast Province").

-13-

Mr. Wambugu has also failed to put forth specific evidence showing that he would face persecution if he were to return to the Central Province of Kenya where his wife is apparently currently residing. While the record indicates that the Mungiki terror gangs have been linked to "several cases of violence and murder allegedly committed by the sect followers in [the] Rift Valley, Central[,] Eastern and Nairobi provinces," *id.* at 206, there is no evidence in the record showing that the Mungiki have been targeting persons in the Central Province who are similarly situated to Mr. Wambugu. Mr. Wambugu has also failed to show that the Mungiki would single him out individually for persecution if he were to return to the Central Province.

Finally, the record indicates that the government of Kenya has banned the Mungiki and taken legal action against them in connection with a number of violent incidents in Kenya in recent years. *Id.* at 441, 445, 451, 452; Appendix of Documents in Support of Petitioner's Amended Emergency Motion for Stay at 192, 196, 206, 225, 227, 231, 240. Given this evidence, we do not believe that a reasonable adjudicator would be compelled to conclude that the government of Kenya is unwilling or unable to control the Mungiki. Consequently, Mr. Wambugu's professed fear of the Mungiki cannot form the basis for a well-founded fear of future persecution.

-14-

The petition for review is DENIED.

Entered for the Court

Wade Brorby
Circuit Judge